**IN THE UNITED STATES BANKRUPTCY COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Nathan Paul Reuter, | ) | Case No. 07- 21128-DRD-11 |
| Debtor. | ) | |
| | ) | |
| Tana S. Cutcliff, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary N0. 08-02009 |
| | ) | |
| vs. | ) | |
| | ) | |
| Nathan Paul Reuter, | ) | |
| | ) | |
| Debtor. | ) | |

**MEM ORANDUM OPINION**

The issues pending before the Court are whether the proposed Chapter 11 Plan of Nathan

Paul Reuter ("Debtor" ) should be confirmed, whether Debtor should receive a discharge and

whether certain debts are nondischargeable.    Debtor filed a voluntary petition for relief under

Chapter 11 on July 27, 2007.    Debtor also filed a Chapter 11 Plan wherein he proposed that

Plaintiffs claims be deemed allowed and liquidated in certain amounts and that such claims would

be satisfied through Plaintiffs exercise of their rights in assets consisting of 57.5% of the issued and

outstanding common stock of Monarch Title Company; equity/equitable interest in Monarch Lake

of less than 50% of total ownership; and equity/equitable interest in Monarch North of less than 50%

of total ownership.  He also proposed that not later than 90 days from the effective date, the assets

would be liquidated and the net proceeds paid, pro rata to Plaintiffs in full payment and satisfaction

of the allowed claims. Further, he proposed that on the 30th day of each month for a period of sixty

months, he would pay, pro rata to Plaintiffs a sum which upon completion of such 60th monthly

payment would be equal to the difference of all other property to be distributed under the Plan to the holders of claims and Debtor's projected disposable income.

Tana S. Cutcliff, James A. Fields, James D. Fields, Joshua P. Haeflinger, LaDonna S. Henderson (as trustee for LaDonna S. Henderson Living Trust), Patricia A Reitz (as Trustee for Frances L. Reitz Trust), Terry J. Schippers, James D. Teegarden II, and Michael S. Trom (collectively the "Plaintiffs" or the "Investors") filed an Objection to Debtor's Second Amended Chapter 11 Plan pursuant to 11 U.S.C. §§ 1129.

Plaintiffs also filed an Adversary pursuant to 11 U.S.C. §§ 523 and 727 seeking a denial of Debtor's discharge and exception of Plaintiffs' debts from discharge. A trial was held on this matter in March of 2009 and the Court took the issues under advisement. This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1). This is a core proceeding, pursuant to 28 U.S.C. §§ 157(b)(2)(I), (J) and (L) which this Court may hear and determine. The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to these proceedings by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, the Court finds that the Debtor's proposed Chapter 11 Plan is not confirmable pursuant to § 1129(a)(3), (a)(11) & (a)(7)(A) . The Court further finds that Plaintiffs debts are nondischargeable pursuant to §§ 523(a)(2)(A) & (a)(19).[1]

---

[1] In its initial Trial Brief filed with the Court, Plaintiffs raised, in addition to the claims addressed in this opinion, claims for relief under 11 U.S.C. § 523(a)(4), the Missouri Merchandising Practices Act, RICO and Federal Securities Act violations. Plaintiffs neither adduced evidence specific to these claims at trial nor did they brief these matters in their Post-Trial Brief. The Court concludes these claims have, therefore, been abandoned. *See, e.g., Farmers' Sav. Bank v. Allen*, 41 F.2d 208, 210 (8th Cir. 1930). The Court will not address Plaintiffs' claims pursuant to 11 U.S.C. §727 as they are inapplicable to this Chapter 11 case. The Court will not rule on Plaintiffs' dischargeability claim pursuant to 11 U.S.C. §523(a)(6) because if finds that the debts owed by Debtor to Plaintiffs are nondischargeable pursuant to §523(a)(2) and there appears to be no benefit to Plaintiffs in terms of additional damages or attorneys' fees were the Court to find the debts were also nondischargeable pursuant to § 523(a)(6).

## I.  FACTUAL BACKGROUND

Debtor graduated from the University of Missouri in 1980 with a degree in agricultural economics.  He started his career at a company by the name of Union Electric Ameren ("AmerenUE") where he was in charge of inventory control for a nuclear power plant.  He was with AmerenUE for approximately fourteen years and then he changed careers.  After leaving AmerenUE, Debtor got involved in the world of real estate development and mortgage finance.  He started a mortgage finance company, Liberty Financial in Springfield, Missouri.  Sometime in 2001, Debtor's ambitions grew and he moved Liberty Financial to Columbia, Missouri where he expanded his operation from providing mortgages to include insurance, investments and other finance opportunities.  Debtor was introduced to Daryl Miles Brown ("Brown") while he was operating Liberty Financial.  Brown was involved in a similar business at Primerica and referred some clients to Debtor.

In August of 2003, Debtor, Brown and Chuck Bowman ("Bowman"), who was an associate of Debtor's at Liberty Financial, decided to go into business together and formed Vertical Mortgage LLC ("Vertical") by filing Articles of Organization with the Missouri Secretary of State.  At that same time, Debtor formed a series of Vertical Group subsidiaries: Vertical Securities, LLC, Vertical Protection, LLC and Vertical Mortgage Banc, LLC.  He later formed additional subsidiaries: Vertical Financial Services, LLC, VACA, LLC and Vertical Market, LLC.  Vertical's Website (the "Website") represented that it was a wholly owned company with subsidiaries.  The Website stated, among other things, that Vertical Group was "a worldwide lender to corporations and corporate owners of significant stock portfolios or vested

stock options seeking to refinance existing debt to better rate and terms, or expand their businesses through internal growth or acquisition."

Debtor was impressed by Brown's entourage of followers from Primerica, which was described as a consumer insurance/investment banking operation, his alleged experience and wild stories of success in the securities investment business, his relationship with an alleged Citigroup investment banker named Al Christy, and his purported rights to trade the assets or leverage the assets to secure securities, of Mr. Christy's $500 million to $600 million dollar Unit Investment Trust, sometimes referred to by Plaintiffs as the Patriot Trust, (hereinafter the "Trust").[2]  Brown represented himself as having designations and licenses from the NASD, the SIPC and the SEC, which allegedly allowed him not only to conduct himself as a broker and dealer of securities, but also to be an advisor of sorts to unlicensed securities sales representatives.

Ricky D. Williams ("Williams") came to be employed by Vertical through his prior relationship with Brown.  They worked together at Primerica for a short period of time.  Prior to being hired by Debtor as Vertical's "National Sales Director," Williams was doing construction and selling power tools.  He has no college education.  He is not licensed to sell securities.  He has no background in handling investments.  He never submitted a resume' or references to Debtor or anyone else at Vertical.  Debtor hired him based solely on his half hour interview and Brown's recommendation.

Vertical's offices were located in what was described by one of the Plaintiffs as an impressive, million dollar building, in Columbia, Missouri, which Debtor and his spouse

---

[2] TR V-1173.

purchased a few years prior to Debtor forming Vertical.[3]   Debtor was the founder and Chief

Executive Officer, Brown was the Chairman of the Board and Bowman was the Chief

Operations Officer.  There were many aspects to Verticals intended business including

mortgages, wealth management, investment services, low-interest refinance and insurance.

According to Bowman, although Debtor's practical day-to-day work at Vertical was working the

investment side of the shop with Williams,[4] he was at the top of the hierarchy of all branches, he

was the man in charge, and there was no one at Vertical who could tell Debtor what to do.[5]

    There were a number of failed investments that are relevant to this case, but with regard

to Plaintiffs' Adversary, there were essentially two rounds of investments that are specifically at

issue in this case.  The first round occurred in late 2004 and involved two investors; Debtor and

Mike Trom.  The second round of investments occurred between late January and early March of

2005, and involved the remaining eight Plaintiffs: Cutcliff, James A. Fields ("J. Fields"), James

D. Fields ("T. Fields"), Haeflinger, Henderson, Reitz, Schippers, and Teegarden.   Although the

investments occurred at different times, the basic mechanics were the same.  In each round, the

Plaintiffs were induced to transfer money into an  escrow account.  The were told that they were

participating in an exclusive, high-yield, investment program, where their principal investment

would be 100% safe, and they would start receiving returns in as early as fourteen to thirty days

after they invested.  The specifics related to how their investments were suppose to remain in the

escrow account and create such fantastic returns are obtuse, however, the evidence is essentially

---

[3]TR V-1191-2.

[4] TR II-471.

[5] TR II-434.

that Plaintiffs thought their principal investment was going to be leveraged against, or be used to acquire, standby letters of credit, which would somehow generate the incredible returns.  The fact is, however, that because Brown, and his cohorts Bud Wofford and Sylvestor Mitchell were criminals, Plaintiffs never received their principal investment back or a single penny of the promised returns.[6]  After all of Plaintiffs' investments had failed and after the FBI conducted its investigation and concurrent with the filing of several civil lawsuits, Brown, Mitchell and Wofford were ultimately indicted and convicted of numerous crimes related to the investment scam.  The evidence establishes that there was no "Unit Investment Trust" or "Patriot Trust" worth millions of dollars which Brown had control of and Al Christy was actually a small-time investor from the suburbs in Indianapolis. Debtor was not criminally prosecuted for the investment scam.

With the exception of Trom, all of the other Plaintiffs wired their investment money to an escrow agent named Dennis Cole in Florida.  Brown was responsible for setting up this account and did so under the name of Cerberus, Inc., a company which he incorporated, but did not formally maintain.  The evidence is that this escrow account was unusual in that it did not require the acquiescence of three parties to divest funds.  In other words, in this situation, Brown set up an account in the name of an escrow agent, but the account really was not an escrow account because the party depositing the money had absolutely no control over it after the deposit.  Because Brown was paying Mr. Cole incredible sums of money, $90,000 for his work as an escrow agent between January and July of 2005, even though Mr. Cole was aware that he was involved in an illegitimate operation, he did not cease taking directions from Brown.  Mr.

---

[6] Plaintiff Henderson received $7,272 back from Brown.

Cole fielded questions from some of the Investors, but did not alert authorities or stop his relationship with Brown.  Mr. Cole was convicted for federal crimes for his involvement in the investment scam at issue in this matter.  As part of his plea agreement, he agreed to cooperate in all court proceedings related to this matter and answer all questions truthfully.

The first round of investments occurred in late November 2004, when Debtor's good friend and neighbor, Mike Trom, was approached by Debtor regarding the possibility of Trom purchasing a business in Springfield, Mo.  After doing significant due diligence, Trom was ready to go forward with the deal and told Debtor that he was able to make the required down payment of $350,000.  At the last minute, Debtor backed out of the deal.   Debtor and Williams proved very effective in attracting investors in this "bait and switch" scheme where they would use Vertical's loan capability to lure potential investors in and then quickly switch the focus to the exclusive, high-yield investment opportunity that they were promoting.

In Trom's case, after Debtor pulled the plug on the financing, he proposed an alternative way for Trom to purchase the business, without needing a traditional loan.  Debtor described the exclusive investment opportunity that he could offer because of his business relationship with Brown.  He described Brown's connections with extraordinarily powerful and wealthy investment people and his control over the assets of the Trust.  Debtor explained that Trom's principal investment would be placed in an escrow account and that his initial investment would be 100% safe.  He described the mechanics of the investment program, the standby letters of credit and how they would be used to generate incredible returns.  He told Trom that he could expect, within fourteen days of investing, to start receiving returns of up to $500,000 a month, for ten months.  The total return on the entire investment was going to be $2 million a month for

ten months, but Debtor cannot recall if he informed Trom of this fact.   Debtor promised him that he would not lose a dime.  However, if Trom wanted in on this deal, Debtor told him that needed to make a decision by the end of that particular week, which gave him four days to act.  Coincidentally, participation in the exclusive deal required the exact same amount of money that Trom had said he could come up with for a down payment on the purchase of the Springfield business, $350,000.  The problem was that Trom could not get that amount of liquid cash by the four day deadline that he had been given, he could only come up with half.

Debtor decided to invest the other $175,000 because, he testified, he wanted to try the program out on himself before recommending it to others.[7]  The list of characters with whom Debtor's and Trom's initial investment was placed reads like the credits from a Soprano's episode.  Dominic Gardino was allegedly a trustee for the Trust.  Mr. Gardino introduced Dr. Bichai, supposedly a trader from Oklahoma who had access to trusts and capital, to Debtor by telephone.  Chris Venti was a New Yorker and was Dr. Bichai's "right-hand-guy."   Venti and Bichai were introduced to Debtor as the guys who were doing the standby letter of credit type of investments, with zero risk to the investors' principal and the opportunity for incredible returns on the investment.   Debtor's due diligence with regard to Dr. Bichai involved asking Brown to check him out and calling an attorney who was listed on one of Dr. Bichai's own documents, who also vouched for his business practice.   There is no written contract associated with Debtor's and Trom's investment because Debtor was told by Bichai, Venti and Gardino that this was a special opportunity, only being offered to he and Trom due to their relationship with

---

[7] TR V-1176.  The Court finds Debtor's stated reasoning for investing his own money, that of trying out the program before trying it out on others, disingenuous considering the other investor in this first investment was his long-term friend and neighbor.

Brown and Brown's charge of the Trust.  Dr. Bichai told Debtor that he did not want anybody

knowing who he was, what he was doing or where he was.[8]

On November 3, 2004, Trom and Debtor each wired $175,000 to an escrow account

under the name of Jennifer B. Schimmel in Texas.   On the fourteenth day after making the

investment, Trom contacted Debtor about whether their returns had come in yet and was

informed that there was a delay due to the holidays.  The next excuse was that the United States

did not want to allow euros into the system, because they [the euros] were flooding the market

and devaluing the U.S. dollar.  The next excuse was that Dr. Bichai was in the Caymans and

needed to travel to the U.S. to sign some paperwork to release the funds.  The next excuse was

that Dr. Bichai had been in a car accident and was under the influence of pain medication and

could not sign the documents in that condition.  All of this information was being fed to Trom

through Debtor and coming from any one of the parties in charge of the investment: Biachi,

Venti, or Gardino.  By February 2005,  Debtor knew that the investment had been a scam and

that his and Trom's money had been stolen by Dr. Bichai.

In March of 2005, Trom was approached by Debtor with a second opportunity to get

involved in another investment at Vertical, which required no additional injection of cash, but it

was an a way for Trom to recoup some of his money.  Trom understood that there were more

investments going on and that if he was involved, he would receive a portion of another

investor's returns, above and beyond what had been promised to that investor, to make him

whole.[9]

---

[8] TR V-1209.

[9] TR I-152.

The second round of investments involved the remaining eight Plaintiffs and occurred

between January and March of 2005.  Similar to Trom, Plaintiff LaDonna Henderson's initial

interaction with Debtor and Vertical was to obtain financing for a business opportunity.

Henderson and her fiancé, Monte Chilters, an employee of Vertical, were attempting to obtain a

loan for a friend of theirs in the convenience store business, to open a new location.  Chilters put

a loan package together and took it to Debtor for approval.  Chilters was informed by Debtor that

loan approval from the bank would require a cash injection of ten percent of the requested loan,

or $300,000, to show that the borrower had liquid assets.  Henderson stated she was willing to

front the cash so that the loan could go through and her fiancé could get his healthy commission.

Debtor was made aware of Henderson's willingness to front the $300,000 in order to make the

deal go through, but at the last minute he pulled the plug.  Debtor next offered Henderson the

opportunity to get involved in the second round of investments.  In January 2005, Henderson met

with Debtor at Vertical's office where Debtor described the mechanics of the investment

opportunity that they were offering.  She was promised her principal investment back in thirty

days and a return on her investment of  $700,000.[10]   On February 1, 2005, Henderson wired

$300,000 to an escrow account in Florida.  Henderson did not receive any money on the thirtieth

day after her investment and, thereafter, she started receiving a multitude of excuses as to why

the money was not available.

J. Fields, and his associate, Reitz, were doing  house rehabs and shopping for loans when

they first became acquainted with Debtor and Vertical.  They learned that Vertical would do the

type of loans they needed when no other bank would, however, it was during their first telephone

---

[10]TR II-238.

conference with Williams and Brown that the discussion switched from obtaining a loan to

getting involved in an investment opportunity.  In mid-February 2005 J. Fields, Reitz and Field's

son, T. Fields went to Vertical's office to learn more about the investment opportunity.  They

met in the Vertical conference room where the Plaintiffs described Debtor as being in control of

the meeting.  Debtor sat at the head of the table, directed the meeting, explained the mechanics

of the investment opportunity, and answered questions.  At this meeting, Debtor made specific

representations to Reitz regarding the timing of the return of his principal investment, as this

affected Reitz's ability to exercise certain stock options Reitz indicated that he had.  Debtor

directed Williams to show Plaintiffs a proprietary document which purported to be an example

of how much money another investor had earned in a similar type of investment.  They were told

that they would start seeing incredible returns within thirty days of their initial investment.

Based on what they saw at Vertical's office and what they learned from Debtor, J. Fields wired

$50,000, T. Fields wired $100,000, and Al Reitz wired $50,000 to an escrow agent in Florida, as

they were instructed to do pursuant to written documentation faxed to them from the Vertical

office by Williams.

　　　　Plaintiff James Teegarden became involved with Vertical and came to know Debtor

because he was friends with Williams.  Teegarden came into some inheritance and asked

Williams if he could get involved in the investments that Williams was doing at Vertical.

Teegarden invested $50,000 by wiring the funds to Dennis Cole in Florida.

　　　　Plaintiff Tana Cutcliff became involved in the investment program because a friend of

hers knew Williams and introduced her to Williams via the internet in January of 2005.  Cutcliff

invested $50,000 in the program in March of 2005.  Cutcliff's only conversations with Debtor

-11-

were over the telephone and the evidence is unclear whether their conversations occurred before or after she decided to invest.

Plaintiff Joshua Haeflinger obtained a home mortgage through a friend of his at Vertical. His friend suggested that he contact Williams on the investment side of Vertical to discuss investment opportunities, which Haeflinger did.  Haeflinger did not meet or talk to Debtor prior to making his investment.  After talking to Williams, he invested $100,000 by borrowing against the equity in his real estate and by taking $30,000 out on credit cards at a 15% interest rate.

Plaintiff Terry "Shugg" Schippers became acquainted with Debtor and Vertical and the investment opportunity through J. Fields as he too was in the business of rehabilitating houses. On March 4, 2005, Schippers invested $50,000.  Schippers did not meet or talk to Debtor prior to investing.

On March 31, 2005,  Federal Bureau of Investigation ("FBI") special agents executed federal search warrants on Vertical and Debtor's personal residence.

On May 6, 2005, the Missouri Attorney General filed an application for a temporary restraining order and a preliminary injunction, in the Circuit Court of Boone County, Mo. seeking to enjoin Vertical, Brown, Williams and Debtor from advertising, soliciting, offering for sale or selling standby letters of credit or any other investment instruments, financial instrument, or investment opportunity.[11]

On  June 15, 2006, Plaintiffs filed a Civil Complaint in the Western District on Missouri against Debtor which was stayed by Debtor's July 27, 2007 Bankruptcy filing.  In a final attempt to recoup their lost investment monies, Plaintiffs filed this Adversary proceeding.

---

[11] Plaintiffs' Exhibit No. 61.

## II.  DISCHARGEABILITY DISCUSSION AND ANALYSIS

### A. Debtor's Direct Liability for False Pretenses and False Representation Pursuant to § 523(a)(2)(A)

Each of the Plaintiffs in this case has pleaded an exception to discharge claiming that the respective debts owed should be nondischargeable as they were incurred as a result of Debtor's false pretenses, false representations and/or through actual fraud pursuant to § 523(a)(2)(A).

Section 523(a)(2)(A) of the Bankruptcy Code states that:

(a) A discharge under section 727, 1141, 1128(a). 1128(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
...
    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by,-

        (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).  Congress did not define the terms used in § 523(a)(2)(A).   However, the United States Supreme Court recently construed the terms in this section to encompass common law misrepresentation or actual fraud.  *AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth),* 212 B.R. 326, 333 (Bankr. W.D.Mo.1997) *(citing  Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).

To prevail under § 523(a)(2)(A) the creditor must prove the following elements:

1) that the debtor made a representation;

2) that at the time the debtor knew the representation was false;

3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor;

4) that the creditor justifiably relied on such representation; and

5) that the creditor sustained the alleged loss and damage as the proximate result of the

representation having been made.  *In re Maurer*, 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000)*;*

*Merchants Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 790 (B.A.P.  8th Cir. 1999) *(citing In*

*re Ophaug*, 827 F.2d 340 (8th Cir. 1987), *as supplemented by Field ,* 516 U.S. at 71).

"A 'false pretense' involves implied misrepresentation or conduct intended to create and

foster a false impression." *Moen*, 238 B.R. at 791 *(quoting In re Guy*, 101 B.R. 961, 978 (Bankr.

N.D. Ind. 1988)).  "[W]hen the circumstances imply a particular set of facts, and one party

knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a

false impression.  This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." *Id.*

*(quoting In re Malcolm*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).

A debtor's silence regarding a material fact may also constitute a false misrepresentation

under § 523(a)(2)(A). *Moen*, 238 B.R, at 791; *see also, e.g., In re Van Horne*, 823 F.2d 1285,

1287-88 (8th Cir. 1987), *rev'd on other grounds*; *In re Larkin*, 189 B.R. 234, 239 (Bankr. D.

Mass. 1995); *In re Demarest*, 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995), *aff'd* 124 F.3d 211,

(9th Cir. 1997); *In re Jenkins*, 61 B.R. 30, 40 (Bankr. D. N.D. 1986); *In re Maier*, 38 B.R. 231,

233 (Bankr. D. Minn. 1984).  For purposes of section 523(a)(2)(A), a "misrepresentation"

denotes "not only words spoken or written but also any other conduct that amounts to an

assertion not in accordance with the truth."  *In re Melancon*, 223 B.R. 300, 308-09 (Bankr. M.D.

La. 1998) (quoting Restatement (Second) of Torts § 525, Comment b (1976)).  In *Van Horne*,

823, F.2d at 1388 (citations omitted), the Eighth Circuit opined that "[a] borrower has the duty to

divulge all material facts to the lender ... While it is certainly not practicable to require the debtor

to 'bare his soul' before the creditor, the creditor has the right to know those facts touching upon

the essence of the transaction."

-14-

Preponderance of the evidence is the standard by which a case must be proven to prevail on a claim under § 523(a)(2)(A). *In re Nelson,* 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006)*; see also Moen*, 238 B.R. at 791 (*citing Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). Exceptions to discharge are normally to be construed narrowly against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code. *Van Horne*, 823 F.2d at 1287. However, "[t]he Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor'." *Moen*, 238 B.R. at 792 (*quoting Cohen v. de la Cruz*, 523 U.S. 213,118, S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998)); *see also e.g., Ophaug*, 827 F.2d at 343 (dishonest debtors do not receive the favor of narrow construction); *In re Hunter*, 771 F.2d 1126, 1130 (8th Cir. 1985) (strict construction of bankruptcy laws against creditors and in favor of debtors applicable only to honest debtors).

As a preliminary matter, the Court must decide whether the Debtor must personally receive the "money, property, or services," that was "obtained by" false pretenses or false representation, or whether a different standard should apply. Three views on this issue have emerged in the courts. *Jacob v. Mones,* 169 B.R. 246, 251 (Bankr. D. Dist. Col. 1994). The first view requires that the debtor personally receive the money obtained by fraud. The second view, characterized as the "receipt of benefits theory," requires only that the debtor derive some benefit from the money obtained by fraud; the person or entity the money was obtained for is irrelevant. The last view holds that a debt may be discharged whenever the debtor fraudulently obtains money, regardless of whether it is for himself and whether the debtor derived any benefit. *Mones*, 169 B.R. at 251.

-15-

The four circuit courts that have considered this issue squarely have adopted the second view, the "receipt of benefits" approach. *See e.g., In re Bilzerian*, 100 F.3d 886 (11th Cir. 1996); *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556 (6th Cir. 1992), *cert. denied*, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277 (5th Cir. 1992); *Ashley v. Church (In re Ashley)*, 903 F.2d 599 (9th Cir. 1990). In adopting the second approach one court reasoned, "[r]equiring that the debtor obtain money for himself limits the meaning of the term 'obtain' when no such limitation is expressly or implicitly in the provision's language." *In re Winfree*, 34 B.R. 879 (Bankr. M.D. Tenn. 1983) (*citing In re Kunkle*, 40 F.2d 563, 564 (Bankr. E.D. Mich. 1930)). The courts that have adopted the first and most restrictive view have provided no reasoning for doing so.

This Court agrees with courts that have found that the "receipt of benefits" approach is the better reasoned view. "[T]he better view appears to be that the debtor need not actually procure money or property for himself. If the debtor benefits in some way from the property obtained through his deception, the debt is nondischargeable." *Moen* 169 B.R. at 252 (*quoting In re Holwerda*, 29 B.R. 486, 489 (Bankr. M.D. Fla. 1983)) (defendant who was principal of company receiving the loan benefitted and therefore "obtained money"); *see also*, *Winfree*, 34 B.R. at 883 (defendant who was principal in real estate project benefitted from money invested by plaintiff in the project).

The Eighth Circuit in *Lawyers Title Ins. Corp. v. Dallam*, 850 F.2d 446 (8th Cir. 1988), held that the fact that the debtor's fraud obtained the benefit for the debtor's corporation rather than for the debtor personally, did not itself alter her liability under § 523(a)(2). Although the *Dallam* Court did not acknowledge the three views described herein, it did find a debt

-16-

nondischargeable where the debtor herself did not benefit personally by the money obtained by

fraudulent representations.  It appears clear that the Eighth Circuit is in agreement that the first,

most restrictive approach, the one which Debtor urges this Court to apply, is not what Congress

intended.

The record in this case establishes that Debtor was involved in the investments because

he expected to make a profit, both for Vertical and for himself.[12]  As will be established later in

this opinion, the evidence is that Debtor and Brown had formed a partnership and that the

investments arose out of the efforts of their partnership.  Brown received the investment funds in

his capacity as a partner and, therefore, the partnership benefitted.  As in *Dallam*, in which the

Court found that the fact that the debtor's fraud obtained a benefit for her corporation rather than

herself personally did not alter her liability under § 523(a)(2)(A), this Court finds that the fact

that Debtor's fraud benefitted the partnership rather than himself personally, also does not

relieve him liability nondischargeability.  Just as in *Dallam*, because the partnership benefitted

from Debtor's fraud, Debtor obtained the benefit of the money through the partnership and that

is sufficient in this Circuit.

In another case, the court considered a situation in which, due to fraudulent

representations regarding investments, the person expecting to obtain money through the

investments never realized any profits.  *McCoun v. Rea (In re Rea)*, 245 B.R. 77, 87 (Bankr.

N.D. Tex. 2000).  In *Rea*, the debtor falsely reported to inexperienced investors, whom he was

soliciting as clients, that he was an experienced, profitable, day trader.  He told them that he had

been experiencing successes in his trading, that he personally would be handling their

---

[12] TR IV-1284-86.

-17-

investment, that he would provide them with daily reports, which would accurately reflect the daily activity with their investments, and that he would minimize their losses by instituting a stop loss protection device, all of which turned out to be false representations. *Id*. at 86.  In fact, the debtor had not been experiencing success in trading, he allowed his unlicenced son to handle the investors' account, the daily reports did not reflect accurate numbers, the debtor did not review the reports as he stated he would and there was no stop loss protection in place. *Id.* at 83-85. Ultimately, the debtor lost $69,340 of the investors' money, filed bankruptcy and argued that because he did not "obtain" any money as a result of his misrepresentations, the debt should be dischargeable pursuant to § 523(a)(2)(A).  The *Rea* Court extended the "receipt of benefits" theory and held that the debtor's "opportunity to profit" constituted a derived benefit and was sufficient to deem the debt nondischargeable pursuant to §523(a)(2)(A).  *Id.* at 87.

The Court finds that under either Eighth Circuit precedent or other well reasoned opinions from other jurisdictions such as *Rea*, that it is on firm ground in holding that Debtor's partnership benefitted by his fraud, that Debtor believed he had, and had, the opportunity to benefit and that each of these instances satisfies the "obtained by" requirement of § 523(a)(2)(A).

### 1.  Debtor's False Representations and False Pretenses

Debtor argues that the law in Missouri is that to constitute fraud, the asserted false representation must be a representation of a past or existing fact rather than a statement regarding what an independent third party may or may not do, or a promise or prediction for a future action.  Debtor argues that the Plaintiffs' basis for their § 523(a)(2)(A) claim must fail because Debtor did nothing more than make promises or predictions regarding how independent

third parties, or escrow agents, would be handling their money if they chose to invest, therefore, his statements cannot support a fraud claim as a matter of law. *See Sindecuse v. Katsaros*, 541 F.3d 801, 803 (8th Cir. 2008) (Court held that investor failed to establish fraud where basis was accountant's promise to facilitate sale of stock in the future.)

The facts in *Katsaros* are completely distinguishable from the facts in this case. Plaintiffs are not asserting their §523(a)(2)(A) claims based on the tort of actual fraud, or on statements about the anticipated behavior of an independent third party. Rather, Plaintiffs assert their claim under the other two torts included in §523(a)(2)(A); false representation and false pretenses. Moreover, their claims are based on statements or omissions by Debtor. Here, Debtor made numerous false representations regarding the nature of the investment and the risks involved. He assured Plaintiffs that the investment was legitimate and safe despite the fact that he knew absolutely nothing about where their money was going, how it was going to be invested or who was going to be safeguarding it. He did not even know who the escrow agent was when he was soliciting investors.[13] Debtor either stated he would be the escrow agent, that he would be in control of the escrow agent or the escrow agent was associated with Vertical, none of which were true. Debtor also failed to advise Plaintiffs of numerous material facts, that had they known, they never would have invested their money. He never mentioned that he and Trom had each just lost $175,000 in a similar investment deal, or that Vertical was being sued by an unhappy investor for over a million dollars for an investment involving a fraudulent escrow agent or that Brown falsely advertised Vertical's liscensure status on its Website and on business cards which resulted in an investigation by the Missouri Securities Commission and a fine. Not

---

[13] TR V-1243.

one of the Plaintiffs in this case is basing a § 523(a)(2)(A) claim on the argument that an

independent third party did not perform as he or she promised they would as Debtor argues.

The Court is convinced that Debtor said whatever he needed to say regarding the safety of the

Plaintiffs' initial investment, and the legitimacy of the investment opportunity and that he

consciously omitted certain facts which would have cast a negative outlook on the opportunity

and likely would have resulted in Plaintiffs not wanting to invest.

Debtor promised Trom, Henderson, J. Fields, T. Fields and Reitz that they would not lose

their principal investment and that it would remain 100% safe in an escrow account.  These

Plaintiffs testified that they would not have invested their money if they thought that there was a

chance that they would lose their initial investment.  Trom testified that Debtor told him, "I

guarantee you won't lose a dime in this deal."[14]  Bowman testified that he overheard a

conversation between Debtor and Trom at Vertical's offices, where Debtor told Trom that his

principal money was protected and that it would be available to him when he needed it.[15]

Henderson testified that Debtor told her that her initial investment would be left in an escrow

account, controlled by Debtor.[16]  J. Fields testified that Debtor told him there was a zero risk that

he would lose his principal investment because "... it was going to be put in an escrow account

that [Debtor] was in charge of, and that no money left that escrow account unless it had his

approval. [Debtor] said I don't know what you can make, but I know you will not lose any."[17]

---

[14] TR I-137.

[15] TR II-456.

[16] TR II-237, 266.

[17] TR II-373-74.

Reitz testified that he specifically told Debtor he needed his principal investment back by a particular date so that he could exercise certain stock options that he had in a separate transaction.  Reitz said Debtor guaranteed that his initial investment would be available by the date he needed it.[18]   T. Fields testified that Debtor told him that he was in control of the escrow account that investors' money went into, which is the reason he could guarantee that they would not lose their principal.   Even Debtor admits that he told some of the Plaintiffs that there was "little or no risk involved" in the investment proposition that they were considering.[19]

The fact, however, is that at the time Debtor was guaranteeing Plaintiffs that their initial investment was going to be 100% safe because it was going into an escrow account, he did not know anything about the escrow account.  He testified that he did not know or trust the escrow agent, Dennis Cole.[20]

> Q.    Did you know where the escrow account was going to be?
>
> A.    That's a toughie.  Could I say exactly at that point in time where it was going to be,  no.  I think the term was it's going to be in an escrow account.  I don't know that I could say right now that I knew it was going to be Dennis Cole in Clearwater.

Debtor knew absolutely nothing about the escrow account that he was representing to Plaintiffs as being 100% safe and legitimate.

Debtor told Trom, Henderson, J. Fields, T. Fields and Reitz that Vertical had a successful history of providing high-yield returns to clients through the same investment program he was offering.   Debtor told Henderson that Vertical had done another investment and showed her a

---

[18] TR III-519.

[19] TR V-1245.

[20] Plaintiffs' Exhibit No. 79, p. 232.

redacted contract to prove that the investment was legitimate.[21]  The evidence is that Debtor

instructed Williams to show Plaintiffs a "proprietary document" which purported to be an

example of an investment that they had done which had produced millions of dollars in returns.[22]

 Trom testified that Debtor told him that he had done an investment like the one they were

getting ready to do and that it had been successful.[23]

        The record is clear, however, that although identical investments had been attempted

before Plaintiffs invested, none of the investments had been successful.  In fact, the evidence is

that, at the time Debtor was soliciting potential investors for the second round of investments,

Debtor knew that the Tamashii Computer was suing Vertical for alleged investment fraud and by

February of 2005, he also knew that he and Trom had each been scammed out of their $175,000

investments.  Yet he told Plaintiffs none of this information.

        In addition to fraudulently misrepresenting Vertical's past successes in the investment

business, failing to advise Plaintiffs of Trom's and Tamashii's failed investments, he also failed

to inform Plaintiffs that he had no experience with high-yield investments:

    Q.    Did you disclose to any of the clients ... that you and [Brown] and the others had
          no prior experience [in generating high returns for others through the investment
          program]?

    A.    I didn't say that I had experience doing that.

    Q.    But you never made clear to them that you lacked experience?

---

[21] TR II-239.

[22] TR II-374 (J. Fields); III-513 (Reitz); III-616 (T. Fields).

[23] TR I-135.

A.    I don't know that it was ever a question.[24]

Debtor either directly represented or allowed the Plaintiffs to believe the false pretense

that Vertical, and its employees were licensed and regulated by the proper securities regulatory

agencies, when in fact none of the parties involved in the investment opportunity that was being

offered to Plaintiffs was licensed to sell securities.  Debtor admitted he knew Williams was not

licensed, but told some of the Plaintiffs that he was.  Debtor testified that Brown told him that he

and Williams had an exemption to "work inside the Trust."  He stated he relied on Brown's

information, despite the fact that Brown had already caused one of Vertical's subsidiaries to be

investigated for securities fraud, that Debtor executed a consent order admitting to the fraud and

that he had to pay a hefty fine.  Debtor did not mention any of these issues to potential investors

and at least one Plaintiff testified that had she known about the false representations made

regarding Vertical's liscensure, she would not have invested with Vertical.[25]

## 2. Debtor's Knowledge That The Representations Were False

"In assessing a debtor's knowledge of the falsity of the representation ..., the Court must

consider the knowledge and experience of the debtor." *Moen*, 238 B.R. at 791 *(quoting In re*

*Duggan*, 169 B.R. 318, 324 (Bankr. E.D. N.Y. 1994)).  "A false representation made under

circumstances where [the maker] should have known of the falsity is one made with reckless

disregard for the truth, and this [satisfies] the knowledge requirement."  *In re Meahyen*, 422 B.R.

192, 202 (Bankr. D. Minn. 2010).  According to the Restatement (Second) of Torts,

"A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is
not as he represents it to be, (b) does not have the confidence in the accuracy of the

---

[24] Plaintiffs' Exhibit No. 79, p. 227.

[25] TR IV-786.

representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies."

Rest. (2d) Torts § 526 (1977).  The record is replete with evidence showing that Debtor knew that he did not have a basis for making the representations that he was making to Plaintiffs regarding the investment opportunity.

Debtor is a college educated, financially successful, sophisticated, business man who had either full or part ownership of two companies in the mortgage finance industry before incorporating Vertical and all of its subsidiaries.  He had a sharp business acumen, and he accumulated a level of wealth and esteem in the community, that some of the Plaintiffs testified contributed to their willingness to participate in the investment program that he was promoting. Debtor argues that he was duped along with the rest of the Plaintiffs by criminals and asserts that the fact that he invested his own money bolsters his argument.  The Court finds that the loss of his own funds may have made him pull the blinders down even further in an attempt to recoup his loss.  The fact that he was reckless with his own money did not give him a right to be equally reckless in his dealings with Trom's.  Although Debtor attempts to disassociate himself from Brown and his investment program, thereby bolstering his rationale for doing absolutely no due diligence into his business associates or having no oversight over the investment program itself, the Court finds his testimony completely disingenuous.  Debtor's testimony is riddled with inconsistencies and implausible explanations.

Debtor trusted Brown to be the Chairman of his newly formed company and to be in charge of millions of dollars of Plaintiffs' money, yet he knew nothing about Brown's personal or professional background.  Debtor admitted that he did not perceive Brown as a highly skilled professional, nor did he believe Brown had any education or training to sell investments or

securities.[26]   Yet, Debtor testified that he perceived the two rounds of investments as completely different from each other based solely on the fact that in the first round an outsider, Dr. Biachi, was calling the shots. In the second, although mechanically identical to the first, because an insider, a business associate,  someone he had "seen for years working with Al Christy with a giant trust making all kinds of money" was in control, there was a legitimacy that was lacking in the first round.[27]  The problem with Debtor's blind faith in Brown's capability to turn the investments into millions, is that there were so many red flags surrounding Brown and the investment deals that he was involved in, that it is not plausible that Debtor did not know that Brown was involved in fraudulent, and  more likely than not, illegal activity.

The lion's share of the evidence establishes that Brown was anything but professional and had Debtor done even minimal due diligence he would have uncovered clues which, at the very least, would have put him on notice that Brown was not what he appeared to be, thus, not worthy of the unfettered control over the investments and esteem that he garnered from Debtor. However, the problem in this case is that Debtor turned a blind eye to all things which suggested illegitimacy.

The first red flag regarding Brown's fraudulent business activities occurred in early 2004 when he and Debtor decided to use the Trust to facilitate development of Debtor's commercial loan program.  Debtor was going to finance a golf resort that was supposedly being developed by one of Brown's associates, Ralph Sweitzer.[28]  In the course of this endeavor, and at the direction

---

[26] Plaintiffs' Exhibit No. 79, p. 150 and p. 281.

[27] TR V-1240.

[28] Plaintiffs' Exhibit No. 79, p. 170-71.

of Brown, Debtor made numerous cash payments to Sweitzer in 2004, which totaled $111,000.[29]

Debtor traveled with Brown and Sweitzer to Germany to try to "get the deal done," but it was a

total failure.  Brown was in charge of the details and Debtor testified that upon arriving in

Germany, he discovered that the contact who was suppose to be there never showed, that they

(Brown and Sweitzer) did not have their paperwork in order, and that the necessary people were

not there to close the deal.[30]  Debtor admits that the entire deal was a fraud and he has since sued

Brown alleging fraudulent misrepresentations and common law fraud.[31]

Also in early 2004, as part of the process of reapplying for mortgage loans with the

banks, Vertical's COO, Bowman, ran a credit report on Vertical's principals, including Brown,

and learned that his credit score was "horrific," probably the lowest he had ever seen.[32]  Brown's

credit score was so low that Debtor had to help Brown get a special lease-to-own mortgage

through a contact of Debtors, and even then Brown was missing rent payments.  Debtor testified

that Brown's poor financial condition, despite Brown's reputation for being a hot-shot in the

investment world, caused him no concern whatsoever.[33]

Although there was less opportunity to be reckless simply due to the fact that Trom was

one of the early investors, Debtor even exhibited reckless behavior surrounding the inducement

of his good friend and neighbor to invest.  Debtor refused to provide Trom with any paperwork

---

[29] Plaintiffs' Exhibit No. 65 ¶18; Plaintiff's Exhibit No. 70; TR VI-1297.

[30] Plaintiffs' Exhibit No. 79, p. 174.

[31] Plaintiffs' Exhibit No. 65.

[32] TR II-445.

[33] TR VI-1344.

memorializing the investment until after the transaction had occurred.[34]  The $25 million

contract, entitled "Joint Venture Private Placement Transaction Agreement," was drafted on the

letterhead and executed with the "corporate seal" of Vertical.[35]  The document includes contact

information for the purported escrow agent and indicates that "Dr. E. Bioschia" will be the

"funds manager."[36]  Because Trom was never given the opportunity to review the document, he

had to rely on Debtor's due diligence and competence in reviewing and understanding the

contract and Debtor, as the CEO of Vertical, was in a better position to get a copy of the

document to do this.  Debtor, however, never reviewed the document:

Q:      [Referring to D. Ex. 52] Did you review this document at the time?

A:      No, I don't review legal documents very often.[37]

Q:      You didn't find it odd that a fellow who's investing $175,000 is not allowed to
        see a copy of a contract for the investment?

A:      Do you find it odd that Mike nor I had it or he didn't even know what he had for
        sure when we did do it or what his return was going to be for sure when we did
        it?[38]

Based on this testimony, Debtor had no basis as the CEO in telling Trom that he should invest

his money in the investment.  He had not reviewed the contract and did not know anything about

the transaction that he was inducing Trom to get involved in.  His actions as the CEO of the

company were reckless.

---

[34] TR I-136-37.

[35] Plaintiffs' Ex. No. 6.

[36] Plaintiffs' Exhibit No. 6.

[37] TR. VI-1309.

[38] TR VI-1322.

Another red flag that Debtor ignored arose in late 2004 when the Missouri Commissioner of Securities conducted an investigation of Vertical Securities, LLC, Vertical and Debtor. The allegation was that someone at Vertical, which as it turned out was Brown, was holding Vertical Securities, LLC out to the public on Vertical's Website and on Vertical business cards as being licensed by the NASD and SIPC, neither of which were true. This issue was resolved on December 20, 2004, when Debtor, as "President/CEO" of Vertical Securities, LLC, signed and consented to a Consent Order issued by the Missouri Commissioner of Securities. In the Consent Order, Debtor stipulated that Vertical Securities, LLC held itself out to be a Broker/Dealer and member of NASD and SIPC, that Brown had given a potential customer a business card identifying Vertical Securities, LLC as a "Broker/Dealer Member NASD/SIPC," that Vertical, Vertical Securities, LLC and  himself were not registered to transact business as a Broker/Dealer in Missouri and that they had made no filings with the NASD or SIPC. He stipulated that they had filed false information with the Missouri Commissioner of Securities and he agreed to pay a $5,000 fine for Vertical Securities, LLC's infractions. When asked about this at trial, Debtor admitted that he did not read the Consent Order stating, "I didn't read it, not even the header,"[39] and said that he didn't think he ever talked to Vertical's attorney about what exactly had occurred regarding the infraction and why he was being fined. Instead of viewing Brown's false representations regarding Vertical Securities' liscensure qualifications as a potential problem, one that resulted in a significant fine, Debtor testified that he did not see this as a big deal.

Q.      But at the conclusion of that process [the execution of the Consent Order], it

---

[39] TR VI-1337.

would be fair to say that you already knew at that point you had a problem with
Daryl Brown, correct?

A.    No.  I think somebody made a mistake, put some stuff on a card they shouldn't
have, and we corrected it.[40]

Another opportunity that Debtor had to take off the blinders, but chose not to involved
the Dennis Cole Escrow Account.  As stated previously in this opinion, Debtor admitted that he
did not know or trust Dennis Cole and that he did not know anything about the escrow
agreement that Brown had entered into with Mr. Cole.  Had Debtor wanted to know about the
escrow agent that he was touting to potential investors as being legitimate and as having the
capability to safeguard their investments, he could have reviewed the written document which
memorialized the agreement,[41] but he admitted that he did not.   This agreement existed in
October of 2004, prior to Plaintiffs investing in the program.   Had Debtor reviewed that
document, he would have known the account was not a typical escrow account, if it was even an
escrow account at all, as there were no protections in place for the depositors and Brown had
complete, unfettered control and access over all funds deposited into the account.  But Debtor
testified that, although he knew there was an escrow agreement, he did not review it because: 1)
Brown told him it was a legitimate account, therefore it was; and 2) an escrow account for the
investment program would have been a "securities issue" something for Brown, or the Trust or
Brown's other company Cerberus, or Al Christy to deal with if something went wrong.[42]  Once
again, Debtor's attempt at distancing himself from the investment program exemplifies the

---

[40] TR VI-1338.

[41] Plaintiffs' Exhibit No. 76.

[42] TR V-1244.

recklessness underlying his various assurances to Plaintiffs.

Debtor admits that he felt "no oligation whatsoever" to ensure that the Plaintiffs received reliable information, explaining that at Vertical "each guy had their speciality. [Securities] wasn't mine."[43]  Referring to the information that he communicated to the Plaintiffs, Debtor testified, "It's up to them to decide what was what."[44]

Prior to the second round of investments, Debtor was aware of at least two investment deals involving Brown that resulted in zero returns and a 100% loss of principal investment.  The first involved a Vertical employee, Marty Forgy, who advised Debtor that her parents had invested money in a business venture that Brown pitched to them, but that nothing ever came of the deal and her parents lost $50,000.  There are insufficient facts to determine whether Brown was liable for the Forgy debacle, but the fact that Brown was involved in an investment deal which resulted in a total loss, coupled with all the other red flags, should have cued Debtor into the fact that Brown did not warrant unquestioned control over transactions that were going through Debtor's company.

The other investment deal involving Brown that went south was Tamashii Computers.  After the first deadline in the Tamashii deal was missed in December of 2004, and the phone calls started coming into Vertical, Brown was not available to take the calls, so Debtor stepped in and handled the situation.[45]  Again, it was Debtor's testimony that Brown's unresponsive conduct to his understandably unhappy client, gave him no pause, and no reason to question

---

[43] TR VI-1320.

[44] TR VI-1320.

[45] TR VI-1339.

Brown's business judgment.  The Court simply does not believe that someone with Debtor's

education and business experience could legitimately overlook so many warning signs.  Debtor

consciously chose to either  minimize the warning signs that Brown was involved in fraudulent

activity, or ignore them completely.  The Court finds that he knew, or should have known, that

he had no basis for the representations that he made to Plaintiffs regarding the escrow account,

the investment opportunity or the safety of Plaintiffs' principal investment.   His reckless

disregard for the truth establishes that he knew his representations were false.

### 3.  Debtor Made the Representations Deliberately and Intentionally With the Intention and Purpose of Deceiving the Plaintiffs

"The intent element of § 523(a)(2)(A) does not require a finding of malevolence or

personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on

the misrepresentations in question."  *Moodie-Yannotti v. Swan (In re Swan)*, 156 B.R. 618, 623

(Bankr. D. Minn.1993) (*citing Hunter*, 771 F.2d at 1129).  "Because direct proof of intent (i.e.,

the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of

the surrounding circumstances from which intent may be inferred." *Van Horne*, 823 F.2d at

1287.  "Intent to deceive will be inferred where a debtor makes a false representation and the

debtor knows or should know that the statement will induce another to act."  *Moen,* 238 B.R at

791 (*quoting Duggan*, 169 B.R. at 324).  A pattern of false statements indicates a debtor's

reckless disregard for the truth.  *Youngblood v. Hembree (In re Hembre)*, 186 BR 530, 532

(Bankr. M.D. Fla.1995).  A series of omissions demonstrates a debtor's fraudulent intent or

reckless disregard for the truth.  *Id*.

Debtor, the CEO and founder of Vertical, admitted that when he communicated with the

Plaintiffs, he told them they were investing with Vertical.[46]  He guaranteed them that they would

not lose their initial investment because it would be returned to them if nothing happened.[47]  He

was described by his COO, Bowman, as the person who could "help close the deal."[48]   He met

regularly with his "National Sales Director," Rick Williams, to discuss "potential investors."[49]

The evidence is that after vetting possible investors, Debtor met with them, fielded questions and

essentially said whatever he needed to say regarding the nature and legitimacy of the investment

opportunity to close the deal, regardless of whether he had any factual basis to support his

statements.  The Court finds that Trom, Henderson, J. Fields, T. Fields and Reitz established that

Debtor intended to induce them to invest their money in the investment opportunity that he was

promoting.

There are insufficient facts in the record to find that Debtor induced Cutcliff, Haeflinger,

Teegarden or Schippers to invest.  Neither Haeflinger nor Schippers communicated with Debtor

prior to investing.  The Court finds the evidence too vague and inconclusive to find that

Cutcliff's telephone conversations with Debtor occurred pre-investment.  Similarly, Teegarden's

testimony regarding his communications with Debtor is contradictory and thus, insufficient for

the Court to find that Debtor induced his decision to invest.

Plaintiffs argue that the Court may still find that these claims nondischargeable on the

theory that these Plaintiffs were induced to not seek the return of their initial investment after the

---

[46] Plaintiffs' Exhibit No. 79, p. 287-88.

[47] Plaintiffs' Exhibit No. 79, p. 229.

[48] TR II-453, II-451-52.

[49] TR V-1160.

initial deadline had passed, but rather to "reinvest" it and hopefully make the fantastic returns

that they had originally discussed.  The argument is that Debtor wanted Plaintiffs to stick with

their investment and had he not induced them to remain invested by advising them to not

cooperate with the FBI and by withholding all the other pertinent information about Brown's

failed investments, fraudulent marketing of SEC liscensure and total lack of knowledge about

what was going on with their money, they likely would have withdrawn their initial investment.

Plaintiffs further argue that there was $600,000 in the account at one point and the fact that some

of the other investors received some money back supports their conclusion that had they

requested their money back, that they too would have received it.

        The Court finds this argument too factually speculative and lacking any reasoned legal

authority.  Plaintiffs provided no authority for their theory that the elements of common law

fraud or the statutory requirements for an exception to discharge are satisfied by their forbearing

a legal right to receive a refund of their initial investment.  The Court's own research revealed a

line of cases which address the issue of whether forbearance of a contractual right constitutes an

"extension of credit" within the meaning of § 523(a)(2) such that the "obtained by" requirement

is satisfied, however, they appear to be distinguishable from the situation at hand.  *See e.g.,*

*Hager v. Beimel (In re Beimel),* 406 B.R. 660 (Bankr. W.D. Pa..2009); *Telmark, LLC v. Booher*

*(In re Booher)*, 284 B.R. 191 (Bankr. W.D. Pa.2002); *Int'l Fidelity Ins. Co. v. Baxter (In re*

*Baxter)*, 294 B.R. 800 (Bankr. M.D. Ga.2003).  Factually, Plaintiffs appear to be asking the

Court to infer that because there was $600,000 in the escrow account, controlled by Brown, that

had these Plaintiffs simply asked for it back, they would have received it, which seems far too

speculative to the Court.  The fact that some of the other investors received some money back

does not itself mean that these Plaintiffs would also have received money back. The Court

cannot infer how a criminal will act. That is simply not possible. There are insufficient facts in

the record to establish that Cutcliff, Haeflinger, Teegarden or Schippers were induced by Debtor

to invest or reinvest in the investment.

### 4.  Plaintiffs Justifiably Relied on Debtor's Representations

The Supreme Court has held that the standard to be applied to exceptions to discharge for

actual fraud under § 523(a)(2)(A) is "justifiable reliance," which is a lower standard than

"reasonable reliance," and entails no duty to investigate. *Field,* 516 U.S. at 73-73.   A person is

justified in relying on a representation of fact "although he might have ascertained the falsity of

the representation had he made an investigation." *In re Oligschlaeger*, 239 B.R. 553, 557-58

(W.D. Mo.1999) *(quoting Fields*, 519 U.S. at 74); *see also* Restatement (Second) of Torts § 540.

An example from the Restatement illustrates the principle:

> . . . if one induces another to buy a horse by representing it to be sound, the purchaser
> cannot recover even though the horse has but one eye, if the horse is shown to the
> purchaser before he buys it and the slightest inspection would have disclosed the defect.
> On the other hand . . . a defect that any experienced horseman would at once recognize at
> first glance may not be patent to a person who has had no experience with horses.

*Field* at 71(*quoting* Rest. 2d Torts § 541, cmt. a).

Although Plaintiffs' reliance may not have been reasonable, based on the evidence in this

case, it was justifiable under the minimal standard set forth by the Supreme Court.  "The

rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in

the common law rule that the victim's contributory negligence is not a defense to an intentional

tort." *In re Treadwell,* 423 B.R. 309, 315 (B.A.P. 8th Cir. 2010); *see also Sanford Inst. for Sav. v.*

*Gallo*, 156 F.3d 71, 74 (1st Cir. 1998) (*citing* Rest. 2d Torts § 540, 541 cmt. a).  "In such

circumstances, the equities weigh in favor of giving the benefit of the doubt to the victim,
careless as it may have been, and even though it could have been more diligent and conducted an
investigation." *Gallo*, 156 F.3d at 74.

This case presents an unusual set of circumstances in that there are two layers of
management, one which was operating at a criminal level and another which was operating at a
reckless level.  The innocent Investors, none of whom had much, if any, investment experience,
did not have a chance.  First, they were lured into Vertical's web of services with promises of
too- good-to-be-true financing or loans no other bank would give them.  Next, after they were on
the hook and had divulged their financial status, they were told that they could be a part of an
exclusive investment opportunity, not available to just anyone, where they could earn great
wealth and be exposed to zero risk.  Some learned these fantastic facts from the CEO and
founder of the successful financial services company that was offering such an amazing
opportunity.  A company that held itself out to the world on the internet as being "a worldwide
lender to corporations and corporate owners of significant stock portfolios or vested stock
options to refinance existing debt to better rate and terms, or expand their businesses through
internal growth or acquisition."  This is just one of many impressive statements that Vertical's
Website reported it was capable of doing.  Several of the Plaintiffs testified that they relied on
Vertical's Website as part of their decision to invest.

The CEO and founder of Vertical himself was adept at creating a false impression of
legitimacy, trustworthiness, and credibility.   He was tremendously wealthy, owned real estate in
the community, owned the beautiful building in which Vertical's offices were located and was
known as a man of his word.   Considering the amount of experience that the Plaintiffs had in

securities and investments, which was little if any, and the impressive nature of the

circumstances surrounding the sale of the investment contracts by Debtor, the Court finds that

Plaintiffs' reliance on Debtor's promises regarding the safety and legitimacy of the escrow

account and the zero risk of their initial investment was justifiable.  Plaintiffs are not asking the

Court to find that it was justifiable for them to rely on promises of great wealth because Debtor

never promised that.  He did promise that he had some level of control, if not total control, over

the escrow account and that their initial investment would not be at risk.  Additionally, Plaintiffs

were told that Vertical had done these types of high-yield investments successfully in the past.

They were shown "proprietary documents" exhibiting fantastic returns, which they too could

potentially earn.  The were led to believe that Vertical and the professionals handling their

investments had the necessary SEC licences.  Debtor himself testified that he thought it was

reasonable for the Plaintiffs to have invested in the investment opportunity that he was offering.

The Court finds that Trom, Henderson, J. Fields, T. Fields and Reitz justifiably relied on

Debtor's representations.

        While the standard articulated by the Supreme Court may be low, the Eighth Circuit has

noted that there are instances where, if there are obvious warning signs, then justifiable reliance

may not be found.  "[I]f there are any warning signs (i.e., obvious or known falsities, *see* Rest.

2d § 541) either in the documents, in the nature of the transaction, or in the debtor's conduct or

statements, the creditor has not justifiably relied on this representation."  *Guske v. Guske (In re*

*Guske)*, 243 B.R 359, 363-364 (B.A.P. 8th Cir. 2000).

        In this case there are discrepancies in the documents.  The contracts have "WesMarc

Commercial Services" as a header, reference entities other than Vertical, and do not mention

Debtor, Williams or Brown.  It could be argued that these discrepancies amount to "obvious

warning signs" which should have cued the Plaintiffs in on the fact that something was not right

with the investment that they were getting involved in.  Here, however, all of the documents

were generated through Vertical's office.  Trom, Henderson, J. Fields, T. Fields and Reitz each

talked directly to Debtor prior to investing their money.  They sat in the conference room of the

impressive building owned by Debtor and were told by Debtor, the founder and CEO, of what

appeared to them be a legitimate, financial services company, that they had a rare opportunity to

participate in a high-yield investment deal because of Debtor's business associate's control over

a multi-million dollar Trust.  They were shown documents of other investors who had

supposedly made millions of dollars by doing exactly what they were about to do.  Once they

decided to invest, all correspondence regarding the investment came directly from Vertical.  The

wiring instructions came from a Vertical employee, Williams.  The contracts, although clearly

depicting names of entities and individuals other than Vertical, Debtor or Brown, were faxed to

Plaintiffs from Vertical and contained Vertical's information.  The Court finds that although the

Plaintiffs' may have overlooked some things in the contracts that an experienced investor, or a

lawyer, or someone who deals with contracts on a daily basis, may have identified as a problem,

because the contracts came directly from Williams, from Vertical, and because all questions

regarding the contracts were fielded through the Vertical office, and all faxes regarding the

contracts went through the Vertical office, it is conceivable to the Court that the Plaintiffs would

believe the unfamiliar names in the contracts were simply companies working with Vertical to

make the investments happen.   The Court finds that based on the facts in this case, that the

inconsistencies in the documents do not amount to "obvious warning signs" of false

representations.

### 5. Debtor's False Representations and False Pretense are the Proximate Cause of Plaintiffs' Damages

Plaintiffs Trom, Henderson, T. Fields, J. Fields and Reitz have been damaged in the amounts that they each invested, plus any other damages that are established under state securities law violations as set forth in detail in the damages section of this opinion.  Absent Debtor's fraudulent misrepresentations and false pretenses, the evidence supports the Court's findings that these Plaintiffs would not have invested in Debtor's investment opportunity and they would not incurred damages.  *See Van Horne*, 823 F.2d at 1288-89 (*quoting Rezac v. Maier (In re Maier)* 38 B.R. 231, 233 (Bankr. D. Minn. 1984)) ( proximate cause element of § 523 requires that the action of the debtor was the act, without which the claimant would not have suffered the loss complained of).[50]

### B.    Debtor's Vicarious Liability for False Pretenses and False Representation Pursuant to § 523(a)(2)

The United States Supreme Court has recognized that a debt may be nondischageable when the debtor personally commits fraud or when actual fraud is imputed to the debtor under agency principles.  *Strang v. Bradner*, 114 U.S. 555, 561, 5 S.Ct. 1038, 1885, 29 L.Ed. 248 (1885).  In the Eighth Circuit, a partner's liability under § 523(a)(2)(A) may be imputed to an agent or partner even in the absence of evidence that the agent or partner knowingly participated in the fraud.  *Treadwell*, 423 BR at 316-18.

Brown, a co-founder and owner or part owner of Vertical, was indicted, tried and

---

[50] The damages element of Plaintiffs' fraudulent misrepresentation and false pretenses claim are included in section III of this opinion.

convicted of crimes related to the fraudulent investment opportunity that Debtor, Brown and Williams solicited Plaintiffs involvement in.   Debtor admits that he believes that Brown's fraud is the cause of Plaintiffs' damages.[51]   No party disputes that fact that Brown committed fraud. The next question for the Court then is whether the evidence supports a finding that Brown and Debtor were partners such that Brown's fraud should be imputed to Debtor under U. S. Supreme Court and Eighth Circuit precedent.

As Debtor points out in his brief, a partnership is statutorily defined as "as association of two or more persons to carry on as co-owners [of] a business for profit." *Hillme v. Chastain*, 75 S.W.3d 315, 317 (Mo. Ct. App. 2002) (*citing* Mo. Rev. Stat. § 358.070 (1994)).   A partnership has also been judicially defined as "a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profits and bear the loss in certain proportions."  *Meyer v. Lofgren*, 949 S.W.2d 80, 82 (Mo. Ct. App. 1997) (*quoting Kielhafner v. Kielhafner*, 639 S.W.2d 288, 289 (Mo. Ct. App. 1982)).

A partnership agreement may be written, expressed orally, or implied from the acts and conduct of the parties.  *Morrison v. Labor & Indus. Relations Comm'n.*, 23 S.W.3d. 902, 908 (Mo. Ct. App. 2000).  The intent of the parties is the primary factor for determining whether such a relationship exists.  *Binkley v. Palmer*, 10 S.W.3d. 166, 169 (Mo. Ct. App. 1999).  The required intent necessary to find that a partnership exists "is not the intent to form a partnership, but the intent to enter a relationship which in law constitutes a partnership."  *Meyer*, 949 S.W.2d at 82. It is Plaintiffs' burden to prove by "clear, cogent, and convincing" evidence that Debtor and

---

[51] Plaintiffs' Exhibit No. 79, p. 283.

Brown operated as though they had formed a partnership such that it would be proper to impute

liability upon Debtor for Brown's fraudulent activity.  *See Hillme*, 75 S.W.3d at 317.

There is no evidence of a written or oral partnership agreement in this case.  However,

there is ample evidence to support the Court's finding that Debtor and Brown conducted

themselves as though they were partners.  The most persuasive evidence of Debtor's intent to

form a partnership with Brown is his own admission in the Petition for Damages which he filed

against Brown in Circuit Court of Boone County, Missouri.  In that petition, Debtor describes the

way in which Brown's fraudulent misrepresentations induced Debtor into entering into the

"partnership agreement" whereby Debtor agreed to allow Brown to acquire a 32.5% ownership

interest in Vertical and to make payments to certain of Brown's associates in exchange for

acquisition of a 50% ownership interest in the alleged Trust.[52]  Debtor testified that they had an

oral agreement to combine a portion of Debtor's company and some of his money with Brown's

alleged Trust and their combined experience in the financial services industry.  According to

Debtor, the plan was for Debtor to manage the mortgage side of Vertical and for Brown to

manage the investments.[53]    Debtor believed that Vertical would be able to make money off of

the Trust, which Brown alleged existed and alleged he had rights to use as part of his investment

plan.  Debtor described the business at Vertical as "a group of, you know, guys that were, you

know, acted as partners and worked together."[54]  Bowman testified that the relationship between

---

[52] Plaintiffs' Exhibit No. 65.

[53] Plaintiffs' Exhibit No. 79, p. 154-156.

[54] Plaintiffs' Exhibit No. 78, p. 11-12.

Brown and Debtor was a partnership.[55]  Brown brought to the partnership his relationship with

the alleged big hitter in the wealth management industry, Al Christy, and his Trust and all of his

self-reported investment expertise and Debtor brought a legitimate company, and "a gentleman

[Debtor] that had the money to back it up."[56]  Bowman explained that because Debtor was

financially stable, he was going to fund the operations until Brown could get the investments up

and running.  The record is replete with examples of the manner in which Brown and Debtor

held themselves out as partners and the Court finds any testimony from Debtor to the contrary

unpersuasive.

There appears to be some question regarding whether recent 8th Circuit opinions have

modified *Strang*, in such a way as to place additional requirements on an otherwise "innocent"

agent or partner when dischargeability is being sought under the theory of vicarious liability.

Under *Strang*, the Supreme Court held that a debtor is liable in bankruptcy for the false and

fraudulent representations of his partner made in the conduct of partnership business.  *Strang*, at

561.  Under *Walker v. Citizens State Bank of Maryville, Missouri (In re Walker)*, 726 F.2d 452,

454 (8th Cir. 1984), the Eighth Circuit concluded that "more than the mere existence of an agent-

principal relationship is required to charge the agent's fraud to the principal. [...] If the principal

either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the

debtor-principal." *Walker*, 726 F.2d at 454.  "Proof that a debtor's agent obtains money by fraud

does not justify the denial of a discharge to the debtor, unless it is accompanied by proof which

demonstrates or justifies an inference that the debtor knew or should have known of the fraud."

---

[55] TR II-450.

[56] TR II-450.

*Walker,* 726 F.2d at 454 (*citing In re Lovich*, 117 F.2d 612, 614-15 (2nd Cir. 1941)).  "If the

debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable

to the debtor-principal.  *Walker,* 726 F. 2d at 454 *(citing David v. Annapolis Banking & Trust*

*Co.*, 209 F.2d 343, 344 (4th Cir. 1953)).  "The debtor who abstains from all responsibility for his

affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he

would have been alerted to the fraud."  *Walker,* 726 F.2d at 454 (*citing In re Savarese*, 209 F.

830, 832 (2nd Cir. 1913)).  *Miller* appears to indicate a willingness to follow *Strang* and limit

*Walker's* knowledge requirement, however, this is not entirely clear.  *In re Miller*, 276 F.3d 424,

429 (8th Cir. 2002).

The Court does not need to resolve this legal question here because the record supports

that Debtor should be held vicariously liable for his partner's fraud under *Strang*, *Walker* and

*Miller*.  Even if the Court were to accept Debtor's argument that he had no idea that Brown was

conducting himself in a less that legitimate manner and that he genuinely did not see the warning

signs of fraud, under *Strang*, there is sufficient evidence to find that the two parties acted as

partners and Debtor, as the innocent partner, may be held liable for Brown's fraud.  As set forth

above, there is ample evidence to support the Court's finding that Debtor should have known

that Brown was engaged in fraudulent conduct, therefore, under the heightened requirement, he

is liable for Brown's fraud under *Walker* as well.

The next question for the Court is whether the record supports a finding that Debtor

should have known that Brown's investment opportunity was fraudulent and that Brown was

engaged in fraudulent activity.  Despite the many red flags that should have caused Debtor to

engage in some investigation of Brown's history and provide some genuine oversight of the

investments, the evidence is that Debtor ignored the warning signs.   The Court has already

identified numerous examples of red flags which should have alerted Debtor to the obvious

conclusion that Brown was engaged in fraudulent activity, including Brown's poor financial

status, his involvement in numerous failed investments, his fraudulent advertising regarding

securities liscensure which resulted in a $5,000 fine, the similarities between the failures in the

first and the second round of investments and ultimately the investigation instigated by the FBI.

Debtor ignored all of the red flags that should have, at the very least, placed him on notice that

Brown may not be as sophisticated or successful in the area of investing money as he purported

to be and that some oversight by the CEO or someone within the company with investment

experience was warranted.   The Court finds, however, that the evidence is so obvious and

egregious that Brown was involved in a fraudulent scheme to steal Plaintiffs' money that Debtor

knew or should have known about the fraud.   Because Plaintiffs' investments and damages arose

from a partnership between Debtor and Brown, pursuant to *Strang* and *Walker*, Debtor has

nondischargeable liability for Brown's fraud upon all of the Plaintiffs.

**C. Debtor's Direct Liability for Violation of Federal Securities Laws Under § 523 (a)(19)**

Section 523(a)(19) renders nondischargeable debts arising from securities law violations

and fraud in connection with a purchase or sale of securities.   This section was added to the

Bankruptcy Code by § 803 of the Sarbanes-Oxley Act of 2002.   *See* Sarbanes-Oxley Act of

2002, Pub. L. No. 107-24, 116 Stat. 745.   Its purpose was to "[a]mend the Bankruptcy Code to

make judgments and settlements based upon securities law violations nondischargeable,

protecting victims' ability to recover their losses." *In re Chan*, 355 B.R. 494, 503 (Bankr. E.D.

Pa. 2006) (*quoting* 148 Cong. Rec. S1787 daily ed. March 12, 2002, statement by Senator

Leahy.)  Section 523(a)(19) "encompasses both statutory securities violations and common law

fraud in securities transactions."  *In re Civiello*, 348 B.R. 459, 464 (Bankr. N.D. Ohio 2006).

Section 523(a)(19) was amended by the Bankruptcy Abuse Prevention and Consumer Protection

Act of 2005 ("BAPCPA").  As amended, § 523(a)(19) provides that a discharge under under 727

does not discharge a debt that:

    (A) is for

        i)    the violation of any of the Federal securities laws, ...any of the State
            securities laws, or any regulation or order issued under such Federal or
            State securities laws; or

        ii)   common law fraud, deceit, or manipulation in connection with the
            purchase or sale of any security; and

    (B)   results, *before, on, or after the date on which the petition was filed*, from

        (i)   any judgment, order, consent order, or decree entered in any Federal or
            State judicial or administrative proceeding;

        (ii)  any settlement agreement entered into by the debtor; or

        (iii) any court or administrative order for any damages, fine, penalty, citation,
            restitutionary payment, disgorgement payment, attorney fee, cost, or other
            payment owed by the debtor.

11 U.S.C. § 523(a)(19) (italicized words added by BAPCPA).

      Prior to the amendment by BAPCPA, it was well settled that § 523(a)(19) required a pre-

bankruptcy judgment, order or settlement agreement memorializing liability for the underlying

securities law violation as a condition precedent for a nondischargeability action in the

bankruptcy court.  The addition of the words  "before, on, or after the date on which the petition

was filed" by BAPCPA has invited a debate as to whether § 523(a)(19) now allows a bankruptcy

court to render its own determination of liability for securities law violations or whether the

liability determination must still be made outside of the bankruptcy court.  *See Chan,* 355 B.R. at

504, (BAPCPA amendment opened the door for either a bankruptcy court or a non-bankruptcy

forum to determine securities law liability in § 523(a)(19) dischargeability actions), *see contra,*

*Nusse v. Jafari (In re Jafari)*, 401 B.R. 494, 496-499 (Bankr. D. Colo. 2009) (The "before, on, or

after the date on which the petition was filed" language only removed the temporal limitation

from the statute, meaning that a non-bankruptcy forum could make a liability determination at

any point in the bankruptcy.  The *Jafari* Court reasoned that Congress's inclusion of subsection

(B) in § 523(a)(19) should not be rendered meaningless by interpreting BAPCPA's amendment

to allow a bankruptcy court to determine liability.)

Although the Court would likely be persuaded by the reasoning set forth in the *Jafari*

opinion, thereby requiring a non-bankruptcy forum to determine liability on Plaintiffs' claims of

securities fraud and securities violations, because of the unique circumstances in this case, it can

save that determination for another day.  The Court finds that Debtor has already consented to

the Bankruptcy Court having jurisdiction to determine the issue of liability and dischargeability,

therefore, Debtor has either waived his right to raise this issue or is estopped from raising it.  As

noted previously in this opinion, on May 6, 2005, the Missouri Attorney General filed a lawsuit

in the Circuit Court of Boone County, Missouri seeking a permanent injunction against Debtor

("State Law Suit"),[57] enjoining any and all activities associated with the advertisement and sale

of securities and investments.  On June 15, 2006,  Plaintiffs filed a lawsuit against Debtor in the

United States District Court for the Western District of Missouri, Case No. 06-4123 ("Federal

Law Suit").  On July 27, 2007, Debtor filed his Bankruptcy Petition and thereafter Plaintiff's

---

[57] Plaintiffs' Exhibit No. 61.

filed this adversary ("Adversary").  The injured parties are the same in the State Law Suit, the

Federal Law Suit and the Adversary and are the Plaintiffs named herein.  In the Federal Law

Suit, Plaintiffs allege numerous causes of actions, including securities fraud, and seek monetary

relief for their alleged injuries.  On September 19, 2008, Debtor executed a Consent Judgment in

the State Law Suit.[58]  In the Consent Judgment, Debtor specifically references the issues raised

by the Plaintiffs in the Federal Law Suit and this Adversary proceeding.  The attorney general

purposely awarded no restitution to the injured parties in the State Law Suit (the Plaintiffs

herein) because Debtor specifically states in the Consent Judgment that the Plaintiffs' claims for

monetary relief will be fully determined and adjudicated by the Bankruptcy Court.  For this

reason, the Court finds that Debtor specifically agreed to the Bankruptcy Court having

jurisdiction to decide all issues raised by Plaintiffs in the Federal Law Suit and this Adversary,

which includes the allegation of securities law violation.

### 1.  Missouri Uniform Securities Act of 2003

Missouri Revised Statute §409.5-509(b) states that a person may maintain a private cause

of action against the seller of securities if the seller sold securities in violation of § 409.3-301.

Section 409.3-301 states that:

It is unlawful for a person to offer or sell a security in this state unless:

(1) The security is a federal covered security;

(2) The security, transaction, or offer is exempted from registration under sections 409.2-201 to 409.2-203; or

(3) The security is registered under this act.

---

[58] Plaintiffs' Exhibit No. 64.

Mo. Rev. Stat. § 409.3-301.

### a. The contracts executed by Plaintiffs constitute a "security."

There is no dispute that none of the investment contracts executed in this case were registered with the Missouri Securities Commission.[59]   Debtor argues that he did not violate Missouri state securities laws because the contracts were not securities that were required to be registered and he was not in the investment business.[60]   Trom, Henderson, J. Fields, T. Fields and Reitz argue that the contracts they executed constitute an "investment contract" which is a "security" under § 409.1-102(28), therefore, pursuant to § 409.3-301, Debtor was required to register the contracts as securities with the Missouri Commissioner of Securities.[61]  They further argue that Debtor violated § 409.1-102(26) when he offered to sell and sold the securities/investment contracts to them.

According to Missouri case law, an investment contract is (1) an investment of money, (2) in a common enterprise, (3) with the expectation of profit from the significant managerial efforts of others.  *State v. Reber*, 977 S.W.2d 934, 937 (Mo. Ct. App. 1998); Mo. Rev. Stat. § 409.1-102(28).   In applying this definition, courts must employ a "flexible approach, looking to substance rather than form, to economic reality rather than terminology . . . ." *State v. Kramer*, 804 S.W.2d 845, 848 (Mo. Ct. App. 1991).  In cases involving nominal partnerships, the key inquiry is whether "the investors of risk capital have, in fact, retained a realistic ability to

---

[59] Because neither Haeflinger, Schipper, Teegarden nor Cutcliff had a pre-investment contract with Debtor, they do not have a claim under § 523(a)(19).

[60] TR VI-1366.

[61] Plaintiffs' Exhibit No. 17 (Henderson), Plaintiffs' Exhibit No. 24 (Reitz), Plaintiffs' Exhibit No. 54 (Haefliger), Plaintiffs' Exhibit No. 43 (James Fields), Plaintiffs' Exhibit No.  43 (Tony Fields).

participate in significant managerial decisions of the enterprise or if they have relinquished in practical reality, actual control of the enterprise to others. *Kramer,* 804 S.W.2d at 848. There is no dispute in this case that Plaintiffs retained no managerial power over the investment of their money. They wired funds to an escrow account identified by a Vertical employee and that was the extent of their involvement.

Plaintiffs presented evidence of the contracts they executed regarding what they were told was an exclusive high-yield investment opportunity with high rates of return and no risk to the initial investment. A 'common enterprise' is "an enterprise in which the fortunes of the investor are interwoven with those of either the person offering the investment, a third party, or other investors. Mo. Rev. Stat. § 409.1-102(28)(D). In the first round of investments, Trom and Debtor's investment money was pooled together in the Jennifer Schimmel escrow account and in the second round the evidence is that the remaining eight Plaintiffs wired their principal investment to the Dennis Cole escrow account where it was pooled together. At one point there was as much as $600,000 of Plaintiffs' pooled funds in that account. Applying the applicable statutory definitions and the facts in evidence, the Court concludes Plaintiffs satisfied their burden of establishing that the contracts they executed constitute "investment contracts" under the Missouri Securities Act.

### b. Debtor "sold" or "attempted to sell" securities.

Debtor cites testimony from Bowman and Williams in support of his next argument that, if the contracts are determined to be securities, he did not violate securities laws as he was "simply not in the securities business." His argument is that he did not actually sell anything to Plaintiffs, therefore, he is not liable.

-48-

The term "offer to sell" includes every attempt or offer to dispose of, or solicitation of an offer to purchase, a security or interest in a security for value.  Mo. Rev. Stat. § 409.1-102(26). Most courts that have interpreted "offer" as it is used in the Securities Act of 1933,[62] have explicitly recognized that an expansive definition is necessary as the term goes "well beyond the common law concept of an offer, and that even if the offer, once accepted, did not give rise to an enforceable contract, that fact is immaterial in determining whether an offer to sell securities occurred." *Moses v. Carnahan,* 186 S.W.3d 889, 902 (Mo. Ct. App. 2006) *(quoting S.E.C. v. Cavanagh*, 1 F. Supp.2d 337, 368 (S.D.N.Y. 1998) *aff'd* 155 F.3d 129, 135 (2nd Cir. 1998)) (observing that the extremely broad definition of "offer" contained in the Securities Act confirms that the definition extends beyond the common law contract concept of an offer and is meant to cover conduct that normally one would not consider an offer in the traditional sense); *Hocking v. Dubois*, 885 F.2d 1449, 1457-58 (9th Cir. 1989) (noting that "the term 'offer' has a different and far broader meaning in securities law than in contract law").   A broad definition of the meaning of "offer" is also consistent with the purposes of the Missouri Uniform Securities Act because fulfillment of the Act's statutory purpose "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Reber*, 977 S.W.2d at 938 *(quoting Garbo v. Hilleary Franchise Systems, Inc*., 479 S.W.2d 491, 499 (Mo. Ct. App. 1972)). "The courts in Missouri have long recognized the need to look to substance rather than form and to examine all the circumstances surrounding the transaction in order to effectuate the purposes of securities laws." *Kramer*, 804 S.W.2d at 847.  "This flexible approach ... is predicated upon a

---

[62] Section 2(3) of the Securities Act of 1933 (15 U.S.C. § 77(b)(3)) defines "offer" and "offer to sell" in exactly the same terms as the Missouri Uniform Securities Act.  *Moses,* 186 S.W.3d at 902.

recognition of the fact that the ingenuity of those who resort to 'get rich schemes' to fleece the

gullible public is boundless.  No hard and fast rule or rigid definition ... which is impervious to

evasion can be devised." *Id*. at 848; *see also S.E.C. v. Addison*, 194 F.Supp. 709, 722 (N.D. Tex.

1961) (noting that under the Securities Act of 1933, the terms "offer" and "offer to sell" are

"broadly defined to include ingenious methods employed to obtain money from members of the

public to finance ventures.")

The record supports the Court's finding that Debtor "sold" and "offered to sell" the

investment contract to Trom, Henderson, J. Fields, T. Fields and Reitz.  Debtor specifically

solicited these Plaintiffs to invest their money in the investment opportunity that he, Brown and

Williams were promoting.  Debtor offered numerous assurances and explanations to quell any

apprehension they may have had.  Debtor did much more than simply announce an opportunity

about some arbitrary investment program.   Bowman testified that Debtor was personally

involved in the sales of investments, that he was likely the main sales contact for Trom and

Henderson, and that for the two Fields and Reitz, he sat in on the meeting at Vertical's office,

answered questions and explained the program.  He was described as the "closer."[63]  Debtor was

not sitting on the side-lines while the investments were being sold through his company, he was

a key player.  Bowman testified convincingly that Debtor's day-to-day work at Vertical involved

working the investment side of the shop with Williams.   He may not have sold mutual funds, or

stocks, but there is ample evidence in the record to support the Court's finding that he sold

investment contracts.   William's conclusory assertions that Debtor did not sell investments is

contradicted by the weight of the evidence and the specific testimony regarding Debtor's

---

[63] TR II-453.

involvement in the sale of the investments to these particular Plaintiffs.   There is competent and

substantial evidence in the record to support the Court's finding that Debtor "offered to sell" and

"sold" "investments contracts" to Henderson, J. Fields, T. Fields, and Reitz, which were not

registered.   Debtor violated Missouri securities laws and the debts associated with these

violations are nondischargeable pursuant to § 523(a)(19).

Plaintiffs also argue that Debtor is liable for statutory securities fraud pursuant to Mo.

Rev. Stat. § 409.5-509(b).   A person is liable to a purchaser for statutory securities fraud if the

person (1) sells a security (2) by means of an untrue statement of a material fact or an omission

to state a material fact necessary in order to make the statement made, in light of the

circumstances under which it is made, not misleading, (3) that the purchaser not knowing the

untruth or omission and (4) that the seller not sustaining the burden of proof that the seller did

not know and, in the exercise of reasonable care, could not have known of the untruth or

omission.   Mo. Rev. Stat. § 409.5-509(b).   All of these elements have been established above.

Trom, Henderson, J. Fields, T. Fields and Reitz established that Debtor (1) sold them an

investment contract that satisfies the definition of a "security," (2) by means of numerous untrue

statements concerning material facts and omissions regarding the legitimacy, safety and

historical performance of previous investments made involving Brown and Vertical (3) the

Plaintiffs did not know about the untruths or the omissions and (4) Debtor either knew or should

have known about the untruths and had he exercised reasonable care in the operation of his

company, he would have known the truth about the investments.   Debtor is liable to these

Plaintiffs for violation of § 409.5-509(b) of the Missouri Securities Act, which makes Debtor's

debts to them nondischargeable pursuant to

§ 523(a)(19)(B).  Plaintiffs' damages are the same as under §409.5-509(b)(1) as set forth below.

## 2. Exemption

Section 409.2-202 of the Missouri Securities Act of 2003 identifies several transactions

which are exempt from the requirements of § 409.3-301.  Debtor argues, in the alternative, that if

the Court finds that the contracts entered into by Trom, Henderson, J. Fields, T. Fields and Reitz

are investment contracts, thus securities pursuant to § 409.1-102(28),  that pursuant to § 409.2-

202(14) or 17 CFR. § 230.505, the Court should find that Debtor was exempt from the

requirement that they be registered.  According to § 409.2-202(14), the following transaction

would be exempt from the registration requirements of § 409.3-301 :

> A sale or an offer to sell securities of an issuer, if part of a single issue in which:
>
> (A) Not more than twenty-five purchasers are present in this state during any twelve consecutive months, other than those designated in paragraph (13);
>
> (B) A general solicitation or general advertising is not made in connection with the offer to sell or sale of the securities;
>
> (C) A commission or other remuneration is not paid or given, directly or indirectly, to a person other than a broker-dealer registered under this act or an agent registered under this act for soliciting a prospective purchaser in this state; and
>
> (D) the issuer reasonably believes that all the purchasers in this state, other than those designated in paragraph (13) are purchasing for investment.

Mo. Rev. Stat. § 409.2-202(14).

The burden of proving an exemption is upon the person claiming it.  *Moses*, 186 S.W. 3d

at 904.  The quantum of proof required is a preponderance of the evidence.  *Id. (citing State v.*

*Garrette*, 699 S.W.2d 468, 509 (Mo. Ct. App. 1985)).  The party opposing the person relying on

the exemption is "not required to allege or prove that [the unregistered] securities were not

exempt from registration."  *Garette,* 699 S.W. 2d at 489-90.  "[E]xemptions in a statute should

be strictly construed ... and registration exemptions are clearly exceptions to the regulatory

scheme." *Florida Realty, Inc. v. Kirkpatrick*, 509 S.W.2d 114, 121 (Mo. 1974); *see also Womack*

*v. State*, 507 S.E.2d 425, 427 (Ga. 1998) (holding that "exemptions from registration are to be

strictly construed in favor of investors"); *Gordon v. Drews*, 595 S.E.2d 864, 868 (S.C. Ct. App.

2004) ("We are mindful that we must narrowly construe exemptions under the Act because the

securities laws are remedial in nature and, therefore, should be liberally construed to protect

investors.")

Debtor adduced no positive or negative evidence to establish facts which would support

eligibility for an exemption under either Mo. Rev. Stat. § 409.2-202(14) or 17 C.F.R. § 230.505

in this case.  Debtor merely argues that if the Court accepts Plaintiffs' evidence, then the one of

the exemptions must apply.  Debtor asks the Court to assume that there were only a certain

number of investors based on Plaintiffs' evidence and assume there was no advertising based on

the lack of evidence adduced at trial.  The Court cannot find that Debtor has met his burden by a

preponderance of the evidence when he is asking the Court to assume that he has established

each and every element of the exemption.  There is no exemption in this case.

### D. Debtor's "Controlling Person" Liability

Plaintiffs argue that Debtor is liable as a "controlling person" under §20 of the Securities

Exchange Act of 1934.  This section provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision
> of this chapter or of any rule or regulation thereunder shall also be liable jointly and
> severally with and to the same extent as such controlled person to any person to whom
> such controlled person is liable, unless the controlling person acted in good faith and did
> not directly or indirectly induce the act or acts constituting the violation or cause of
> action.

11 U.S.C. §78t(a).  Plaintiffs concede that such liability has been held dischargeable in this

Circuit, although they are incorrect in asserting that decision was made with reference to

§523(a)(19) in *In re Miller*, 276 F.3d 424 (8th Cir. 2002). In fact, *Miller* holds that there is no

"controlling person" liability under §523(a)(2)(A), and the case does not discuss liability under

§523(a)(19). In *Miller*, the 8th Circuit noted that the United States Supreme Court in *Strang*,

recognized that a debt may be nondischargeable when a debtor personally commits fraud or

when fraud is imputed to the debtor under agency principles. *Miller,* 276 F.3d at 429 (*citing*

*Strang*, 114 U.S. at 561). The Court also noted that §20(a) of the Securities Exchange Act of

1934 renders an innocent person liable when a person over whom the innocent person exercised

control committed actual fraud. *Id.*   However, the Court refused to extend the principles of

imputed nondischargeability beyond traditional agency to the "controlling person" concept.

"Section 523(a)(2)(A) of the Bankruptcy Code prevents persons from committing actual fraud

and then wiping away their resulting debt. ... Section 20(a) of the Securities Exchange Act of

1934, on the other hand, is designed to ensure that securities brokers act properly and supervise

their employees, and, therefore, imposes liability in those cases in which the supervisor did not

directly participate in the bad acts." *Id.*   The *Miller* Court found no reason to combine the two

separate provisions of law, leaving that task up to Congress and this Court is bound by that

decision. Plaintiffs, albeit somewhat misguidedly, ask the Court to find that *Miller* was wrongly

decided, but this Court is bound by that 8th Circuit decision and does not have the authority to

disagree with it.

Accordingly, the Court cannot find any debt Debtor may have as a controlling person

nondischargeable under § 523(a)(2)(A). If Plaintiffs had in fact established that Brown,

Williams or any other person controlled by Debtor engaged in primary violations of the

securities laws such that Debtor was liable as a controlling person, that liability is itself a securities law violation and may thus be nondischargeable under § 523(a)(19).  However, Plaintiffs did not make this argument and the Court need not decide the question.  The Court need not consider Debtor's liability as a controlling person for the additional reason that it has found him liable for direct securities violations.

### III. DAMAGES

There are two separate measures of damages in this case: (1) common law damages resulting from Debtor's direct and vicarious fraudulent representations and false pretenses and (2) statutory damages for Debtor's securities violations allowable under Mo. Rev. Stat. §409.5-509(b)(3).

### A. Common Law and Statutory Damages

Under common law fraud, damages are measured at the time of the fraudulent transaction, although special damages directly caused by the fraud are also recoverable.  *Little v. Morris*, 967 S.W.2d 685 (Mo. Ct. App. 1998).  The general rule is that the defendant is liable for any injury that is the direct and natural consequence of the plaintiff's acting on the defendant's false representation.  *Rogers v. Hickerson*, 716 S.W.2d 439 (Mo. Ct. App. 1986) *rev'd on other grounds*.  In this case, the Court finds that Debtor is liable for the actual damages, i.e., the principal amount of money that each Plaintiff invested in the investment opportunity, that are a result of Debtor's fraudulent representations and false pretenses.

Plaintiffs' actual damages are as follows:

| Plaintiff: | Actual Damage Amount: |
| --- | --- |
| Mike Trom | $175,000 |
| LaDonna S. Henderson | $300,000-$7,272 (refunded amount)= $292,728 |
| James A. Fields | $50,000 |
| James D. Fields | $1000,000 |
| Patricia A. Reitz | $50,000 |
| Terry J. Schippers | $50,000 |
| James D. Teegarden | $50,000 |
| Joshua P. Haeflinger | $100,000 |
| Tana S. Cutcliff | $50,000 |

Section 409.5-509(b)(3) of the Missouri Securities Act of 2003 states that

Actual damages in an action arising under this subsection are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the rate of eight percent per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court.

The evidentiary record in this case establishes that Debtor is liable to Plaintiffs Trom, Henderson, J. Fields, T. Fields and Reitz for violation of Mo. Rev. Stat. §409.3-301, and therefore, entitled to statutory damages under Mo. Rev. Stat. § 409.5-509(b)(3) in the amounts set forth above.

## B. Consequential Damages

In fraudulent misrepresentation cases, the plaintiff may have a choice of remedies, which may be pursued alone or sometimes in combination. Plaintiff may (1) elect to rescind the transaction, tender the benefit received, and seek to recover the purchase price or other consideration paid; (2) affirm the contract and seek to recover the difference in value between

what was promised and what was actually received; or (3) seek to recover damages for breach of contract as well as in tort for the fraud. *See Trimble v. Prancna*, 167 S.W.3d 706 (Mo. 2005) (en banc) (string citations omitted). Consequential damages, such as lost profits or expenses incurred due to the defendant's wrongful conduct are recoverable in addition to benefit of the bargain damages. *Davis v. Clearly Building Corp.*, 143 S.W.3d 659, 669 (Mo. Ct. App. 2004). Consequential damages are those damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement. *Ullrich v. CADCO, Inc.*, 244 S.W.3d 772, 779 (Mo. Ct. App. 2008) (*citing St. John's Bank & Trust Co. v. Intag, Inc.*, 938 S.W.2d 627, 629 (Mo. Ct. App. 1997)). Consequential damages, such as lost profits or expenses incurred due to the defendant's wrongful conduct are recoverable in addition to benefit of the bargain damages. *Davis*, 143 S.W.3d at 779. Lost profits are recoverable as part of the actual damages in Missouri fraud cases if they can be proved with reasonable certainty, and naturally and proximately resulted from the defendant's fraud. *CADCO, Inc. v. Fleetwood Enterprises, Inc.*, 220 S.W.3d 426, 434 (Mo. Ct. App. 2007). There is no statutory right to consequential damages in the applicable securities violations statutes. In order for the Court to award Reitz consequential damages, it must find that he proved them with reasonable certainty and that they naturally and proximately resulted from Debtor's fraudulent conduct.

Reitz claims he is entitled to consequential damages resulting from his lost opportunity to exercise his option to acquire certain stock, before an expiration date and resell the acquired stock for profit. He argues, and the facts support, that he informed Debtor that he needed his initial investment of $50,000 returned by a certain date so that he could use that money to

exercise his option with regard to these SLS warrants.  Debtor assured him that he would have

no problem getting his initial investment back.  The problem with the evidence regarding Reitz's

lost opportunity to exercise his option, however, is that it is too remote and speculative for the

Court to find with reasonable certainty that he actually would have generated any particular

profit on a subsequent sale.   While the option price is known and the stock prices in evidence

were such that the options were "in the money" (meaning that the value of the stock was in

excess of the cost to exercise the options), the Court cannot conclude with any degree of

reasonable certainty based upon the evidentiary record what profit Reitz may have realized on

the ultimate sale of the stock.  He did not, for example, testify that he would have immediately

sold the stock, which might have permitted the Court to utilize the stock prices in evidence to

calculate a profit.  If he would in fact have held the stock for some period of time, it is unclear

that the value of the stock would have been at that time and there would be no evidentiary basis

for the Court to award any particular amount as damages.  Accordingly, the Court finds this

aspect of his damages to be too speculative and remote for it to find with reasonable certainty

that Reitz satisfied his burden with regard to his request for consequential damages.

## C. Punitive Damages

Punitive damages may be awarded "if the evidence and the inferences drawn therefrom

are sufficient to permit a reasonable [trier of fact] to conclude that the plaintiff established with

convincing clarity-that is, that it was highly probably-that the defendant's conduct was

outrageous because of evil motive or reckless indifference."  *Grady v. Curators of University of*

*Missouri*, 213 S.W.3d 101, 109 (Mo. Ct. App. 2006).  Factors that the Court should consider

when assessing punitive damages include: (1) degree of malice, positive wrongdoing or

criminality characterizing the act; (2) regarding the injured party-a) age, sex and health; b)

character; c) injury suffered; d) financial worth; (3) regarding the defendant-a) intelligence,

standing or affluence; b) financial worth; c) character; and 4) all circumstances surrounding the

[bad act], including mitigating and aggravating circumstances.  *See Carpenter v. Chrysler Corp.*,

853 S.W.2d 346, 365 (Mo. Ct. App. 1993); *Maugh v. Chrysler Corp.*, 818 S.W.2d 658, 663 (Mo.

Ct. App. 1991).  There is no authority for the award of punitive damages on the securities law

violation claim.  See Mo. Rev. Stat. § 409.5-509(b)(3); *see also Gales v. Weldon*, 282 S.W.2d

522 (Mo. 1955) (plaintiff who sought remedy pursuant to a securities statute, that did not provide

for punitive damages, could not recover punitive damages for alleged fraud, even though she

might have recovered such damaged in an action based solely on fraud.)

 After considering all relevant factors, the Court finds that an award of punitive damages

is appropriate in this case.   Debtor misrepresented or omitted numerous facts in this case which

caused Plaintiffs' damages.   He admitted that he intentionally did not read relevant legal

documents, that he did not know anything about the escrow account in which the investors

money would be placed and about which he made numerous promises regarding its safety and

legitimacy and he purposely ignored blatant warning signs of illegitimate and fraudulent conduct

by Brown, all so that he could profit from the fraudulent scheme that Brown had formulated.  He

was in a far better position than the Plaintiffs in terms of intelligence, affluence and financial

worth to have the correct information, he just chose not to either acknowledge it or acquire it.

Debtor aggravated the situation after the FBI became involved by encouraging the Plaintiffs not

to cooperate with legal authorities, to "circle the wagons" so that they could get their returns

faster.  The evidence of recklessness and indifference to the Plaintiffs is egregious in this case

and warrants an award of punitive damages.

In his own Plan, Debtor lists Plaintiffs' damages as twice the actual amount, for a total liquidated damages amount of treble damages. Based on the facts of this case, the Court finds this amount appropriate and reasonable under the circumstances.

### D. Attorney Fees

The Bankruptcy Code makes no provision for an award of attorneys' fees to a prevailing creditor and there is no contractual basis for such an award in this case. Plaintiffs Trom, Henderson, J. Fields, T. Fields and Reitz have established, however, that Debtor violated Mo. Rev. Stat. §409.3-301, and, therefore, they are entitled to recover reasonable attorneys' fees pursuant to Mo. Rev. Stat. §409.5-509(b)(3). The Court will schedule a hearing to determine the amount of attorneys' fees to be awarded.

### IV. PLAN CONFIRMATION DISCUSSION AND ANALYSIS

On June 20, 2002, Debtor and his wife organized Missouri limited liability companies for Green Meadow Properties, LLC ("Green Meadow Properties") and Bluff Creek Properties, LLC ("Bluff Creek Properties"). Pursuant to the Operating Agreements for these companies, Debtor and his wife became the sole owners of the companies as "tenants by the entirety."[64] On September 16, 2005, Debtor and his wife entered into a Revocable Trust Agreement which created the "Kathleen S. Reuter Revocable Trust.[65]" On that same date, Debtor and his wife also entered into a separate Revocable Trust Agreement which created the "Nathan P. Reuter

---

[64] Debtor's Exhibit 109.

[65] Id.

Revocable Trust" (collectively referred to as the "Trusts")[66].  Contemporaneously, they entered

into an Interspousal Agreement[67].  They transferred Green Meadows Properties, Bluff Creek

Properties and cash proceeds from the sale of a residence located in Columbia, Missouri, into the

Kathleen S. Reuter Revocable Trust and certain life insurance policies into the Nathan P. Reuter

Revocable Trust (the "Trust property")[68].  Debtor is claiming exemptions under § 522(b)(2)(B)

in the Trust property.  Additional specific details regarding the Trusts and the Trust property are

discussed in the following analyses where necessary.

Debtor filed the Second Amended Plan of Reorganization Dated July 29, 2008 (the

"Plan"), and the First Amended Disclosure Statement Dated July 29, 2008 (the "Disclosure

Statement").  On September 8, 2008, Plaintiffs filed an Objection to Debtor's Second Amended

Chapter 11 Plan of Reorganization (the "Objection").  Plaintiffs' Objection set forth eight

specific arguments for denial of confirmation of Debtor's Plan.  However, the Court notes that

the Plaintiffs briefed only three of those arguments.  Therefore, arguments that Plaintiffs' failed

to brief the Court will treat as abandoned and limit this opinion to discussion of the arguments

contained in Plaintiffs' post-trial brief.  Specifically, Plaintiffs raised the following three

objections to confirmation:  (a) the plan was not proposed in good faith under §1129 (a)(3); (b)

the plan is not feasible under §1129 (a)(11); and (c) the plan is not in the best interest of the

creditors under §1129 (a)(7).

In order to confirm a Chapter 11 Plan, the Court must find that each of the required

---

[66]*Id.*

[67] Debtor's Exhibit 109.

[68] Debtor's Exhibit 109.

elements of §1129(a) have been satisfied. *In re Gilbertson Restaurants LLC*, 2005 WL 783063

(Bankr. N.D. Iowa 2005). The proponent of the plan bears the burden of proof with respect to

each element of §1129(a) by a preponderance of the evidence. *Id*.

### A.     11 U. S. C. § 1129(a)(3): Good Faith

Plaintiffs argue that the Plan should not be confirmed because Debtor filed the

bankruptcy in bad faith.  Specifically, Plaintiffs contend that the motive behind Debtor filing a

Chapter 11 was not to restructure his debt as a result of being in serious financial distress, but

rather, to avoid being found personally liable to Plaintiffs as a result of a civil lawsuit pending

against Debtor in federal district court.  Plaintiffs also complain that Debtor has engaged in a

pattern of concealment and evasion with regard to the true amount of his disposable income such

that conversion or dismissal of the bankruptcy case is warranted.  As Debtor noted, the problem

with raising these arguments with regard to conversion or dismissal in the Objection is that they

should have been brought in the form of a motion which the Plaintiffs had not done until March

10, 2010, and which the Court will deal with separately.  A motion to dismiss the case for bad

faith in filing on the basis of denying Plaintiffs their right to litigate in their chosen forum at this

juncture is not timely considering the fact that the parties expended considerable time and

resources on preparing for and attending the trial on the plan confirmation and dischargeability

issues.  The proper time for Plaintiffs to have raised such issues would have been prior to the

Court conducting a week long trial. Accordingly, the Court will not entertain the good-faith

argument in so far as it relates to dismissal of the bankruptcy case.

However, Plaintiffs timely raised lack of good-faith under § 1129(a)(3) in their Objection

to confirmation of the Plan and the Court will address that part of Plaintiffs' Objection that

argues that confirmation of the Plan should be denied based on the Debtor's lack of good faith and will take Plaintiffs' arguments for dismissal of the bankruptcy case into account in so far as they are relevant to the confirmation analysis.

Section 1129 (a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." *In re Kellogg Square Partnership,* 160 B.R. 434, 352 (Bankr. D. Minn. 1993). The term "good faith" is not defined by the Bankruptcy Code, but in the 8th Circuit, a Chapter 11 plan is "... considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Hanson v. First Bank*, 828 F.2d 1310, 1315 (8th Cir. 1987) (overturned on other grounds); *see also*, *In re Coastal Cable T.V. Inc.,* 709 F.2d 762, 764 (1st Cir. 1983); *Matter of Nikron, Inc.,* 27 B.R. 773, 778 (Bankr. E.D. Mich. 1983). Similarly, in the context of a Chapter 13 reorganization, courts have interpreted the identical "good faith" language contained in § 1325(a)(3) to require the bankruptcy court to review the proposed plan for accuracy and "a fundamental fairness in dealing with one's creditors." *In re Rimgale,* 669 F.2d 426, 432-33 (7th Cir. 1982) (quoting *In re Beaver,* 2 B.R. 337, 340 (Bankr. S.D. Cal. 1980). Thus, for purposes of determining good faith under section 1129(a)(3), as well as section 1325(a)(3), the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

According to the good faith requirement of section 1129(a)(3),the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code.  The proper inquiry is whether the plan constitutes an abuse of the provisions, purpose or spirit of the Code.  The court should

judge each case on its own facts after considering all the circumstances of the case.  *See Noreen v. Slattengren,* 974 F.2d 75, 76 (8th Cir. 1992).

Whether a plan is proposed in good faith turns on an examination of the totality of the circumstances surrounding the plan *and* the bankruptcy filing. *Noreen,* 974 F.2d at 76; *Handeen v. LeMaire* ( *In re LeMaire* ), 898 F.2d 1346, 1349 (8th Cir. 1990). The Court must focus on factors such as whether the debtor has stated debts and expenses accurately; whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether the debtor has unfairly manipulated the Bankruptcy Code. *Noreen,* 974 F.2d at 76; *LeMaire,* 898 F.2d at 1349; *In re Trans World Airlines, Inc.,* 185 B.R. 302, 314 (Bankr. E.D. Mo. 1995) (court should consider whether the plan has been proposed with the legitimate and honest objective of preserving the Debtor's business while maximizing the return available to creditors). Pre-filing conduct is not determinative of the good faith issue, but it is nonetheless relevant. *LeMaire,* 898 F.2d at 1352. In essence, the good faith inquiry looks at the debtor's fairness in dealing with creditors.  *In re Barger,* 233 B.R. 80, 83 -84 (B.A.P. 8th Cir. 1999).

The totality of the circumstances of this case evidence bad faith on the part of the Debtor. First, as noted above, it is appropriate for the Court to look at the circumstances surrounding the filing of the bankruptcy.  As Plaintiffs' point out, at the time of the bankruptcy filing, Debtor was facing a civil lawsuit in federal district court and Plaintiffs had already obtained a default judgement against Vertical Group as a co-defendant.  Debtor admitted that his reason for filing bankruptcy arose from his concern over the Plaintiffs' claims against him personally[69].  Further, Debtor admits in his Disclosure Statement that the reason he sought relief under Chapter 11 was

---

[69]TR VI-1375-1376.

so that his ability to satisfy the claims asserted against him by Plaintiffs was "both finite and foreseeable.[70]" While seeking relief to lessen the effects of litigation is not *per se* bad faith, Debtor's motivation in seeking relief is a factor that must be considered when determining good faith. *See Banks v. Vandiver*, 248 B.R. 799, 805 fn 2 (B.A.P. 8th Cir. 2000). This Court will take into account where necessary the fact that Debtor filed bankruptcy during a pending federal civil lawsuit, but ultimately believes that this issue is not sufficient in itself to demonstrate bad-faith on the part of Debtor. The Court recognizes that the bankruptcy filing may have caused considerable delay and expense to Plaintiffs, but they did get their "day in court" to litigate their individual claims against Debtor, albeit in bankruptcy court rather than district court, and were not substantially prejudiced in the litigation of their individual claims by Debtor's filing bankruptcy.

However, Debtor's motivation and sincerity (or lack thereof) in seeking reorganization and formulating the Plan do counsel against a finding of good faith. Chapter 11 is intended for valid reorganization of "financially troubled businesses," not to permit financially solvent companies to "rapidly conclude litigation to enable a continuation of their business." *See In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 380 (8th Cir. 2000). The Court seriously doubts whether Debtor intended for the filing of his Chapter 11 to reorganize his financially troubled businesses, especially in light of the fact that Debtor has proposed to enter into a consent judgment with the State of Missouri that he will not continue in any of his investment businesses[71].

Further, as Plaintiffs note in their Brief, Debtor has no mortgage or other consumer debt and the other liability listed on Debtor's Schedules, that of a $2,956.83 hospital bill, was paid by

---

[70]Disclosure Statement, II, B.

[71]*See* Plan, Article 4.3.7 (a)-(c).

Debtor after filing bankruptcy.  Debtor also testified that he is current on all of his bills and that

his wife gives him around $4,000 a month from the Kathleen Reuter Trust to live and pay bills.

Debtor has failed to list this income on his Schedules.  Debtor has also failed to amend his

Schedules with updated values for his interest in Monarch Title Company despite testifying to the

fact that such company is indeed worth more than $0.  Also, it appears to this Court that, prior to

filing his bankruptcy case, Debtor designed and structured his entire asset interest so that his

creditors could not receive any payment from such assets.  As discussed at length below, he and

his spouse put most, if not all, of their valuable assets into revocable trusts in what appears to this

Court to be a veiled attempt to shield them from his creditors.  Further, he contributed his labor at

no cost to build the house that he and his spouse currently live in and that is owned by one of his

L.L.C.'s and held in the Kathleen Reuter Trust[72].  His Schedules indicate that he has no debt other

the unliquidated claims of Plaintiffs.

Also, Debtor's Plan indicates a net negative monthly income which in and of itself does

not exhibit bad-faith but the Court has doubts as to whether Debtor is maximizing his income. He

is voluntarily choosing to be employed as an independent contractor earning considerably less

than he could be expected to earn based on his past earnings and experience. Debtor has testified

and disclosed in his Disclosure Statement that he has a college degree in agricultural economics

and was employed by Union Electric Ameren for many years making up to $50,000 annually. Tr.

I-31-I:32.  After leaving there, he entered the world of real estate development and mortgage

finance and then opened his own mortgage lending business and later helped organize the Vertical

Group investment businesses.  While the fate of those businesses has been well documented, the

---

[72]TR- I-84:19-86:10.

fact that Debtor has the knowledge and wherewithal to open and organize new businesses, and

that he was employed for 20 years at Ameren, indicates greater earning potential than he is

currently realizing. Debtor testified that he is currently working as an independent contractor

carpenter earning a maximum of approximately $20,000 per year.   It is not clear to the Court that

Debtor has proposed his Plan with the objective to deal fairly with and maximize the return to

Plaintiffs, nor to seek a true reorganization of his business.

Each of these actions taken alone may not lend itself to the conclusion that Debtor acted in

bad faith in proposing his Plan, but taken together in a totality of the circumstances analysis,

Debtor's actions have convinced the Court that his Plan was not proposed in good faith.  Indeed,

the Debtor's admitted motivation for seeking chapter 11 relief suggests that his Plan was proposed

not with the intention of satisfying Plaintiffs' claims to the greatest extent possible, but with the

intention of *avoiding* payment of those claims to the greatest extent possible, and the meager

repayment percentage proposed by the Debtor's plan supports this conclusion. Such a purpose is

the antithesis of good faith and not consistent with the spirit and purpose of Chapter 11.

## B. 11 U.S.C. § 1129(a)(11): Feasibility

One of the requirements of confirmation is a finding by the court that "[c]onfirmation of

the plan is not likely to be followed by the liquidation, or the need for further financial

reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation

or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  This statutory provision

established what is commonly known as the "feasibility" requirement.  *See In re Danny Thomas*

*Properties II Limited Partnership*, 241 F.3d 959, 962 (8th Cir. 2001) *citing Monnier Brothers*, 755

F.2d 1336, 1341 (8th Cir. 1985).  The 8th Circuit Court of Appeals recently stated that:

-67-

> "In determining whether [a plan] is feasible, the bankruptcy court has an obligation to
>
> scrutinize the plan carefully to determine whether it offers a reasonable prospect of
>
> success and is workable."

*Monnier*, 755 F.2d at 1341.  The success of a debtor's proposed plan need not be guaranteed, but a

bankruptcy court cannot approve a plan unless there is at least a reasonable likelihood of success.

*Id*.  Debtors bear the burden of establishing that their proposed plan is feasible by a

preponderance of the evidence.  *Id. citing In re Eucerle Farms, Inc*., 861 F.2d 1089, 1091-92 (8th

Cir. 1988).

Plaintiffs first argue that Debtor's plan shows no disposable income and cannot pay the

Missouri Attorney General $200 per month as proposed[73] nor can it pay professional fees or

administrative expenses such as trustee fees which are required to be paid.  Based on the Court's

review of the evidence, Debtor's Schedule I shows disposable income of $2,000.  Debtor also

testified that he receives approximately $4,000 per month from his wife and the Trust.  Income

from all sources must be claimed as income by Debtor and would give him a total of $6,000

monthly income.  Debtor's Schedule J shows monthly expenses of $5,900 which would leave

$100 per month of disposable income.  This amount would not cover even the proposed $200 per

month to be paid to the Missouri Attorney General.  There is no evidence that if Debtor continues

as a self-employed carpenter that he will increase his income.  He testified that the local building

market is down and will not increase in the foreseeable future and that he is earning the most that

he can as a carpenter.  Debtor gave no indication that he has any intention to pursue more

lucrative career opportunities.  Debtor testified that he would sell his interest in the Monarch Title

---

[73]Debtor testified to an agreement to pay the Missouri Attorney General $5,000, but has not amended his
Plan to reflect the change.  The Amended Plan on file shows the amount owed to be $10,000.

businesses for $50,000.  However, this amount will be paid to Plaintiffs leaving nothing with

which to pay Debtor's professional fees and other administrative expenses.

The Court cannot, in this instance, find that Debtor's Plan could be termed "workable."

Nothing in the Debtor's testimony, Plan or Disclosure Statement affords the Court a basis upon

which to place confidence in the Debtor's future income or expense projections or Debtor's

ability to fund even the minimum monthly plan payment required to the Missouri Attorney

General.

### C. 11 U.S.C. § 1129(a)(7)(A): Best Interest of Creditors

Section 1129(a)(7)(A) requires that:

[w]ith respect to each impaired class of claims or interests-

> (A) each holder of a claim or interest of such class-

>> (i) has accepted the plan; or

>> (ii) will receive or retain under the plan on account of such claim or interest
>> property of a value, as of the effective date of the plan, that is not less than
>> the amount that such holder would so receive or retain if the debtor were
>> liquidated under [C]hapter 7 of [the Bankruptcy Code] on such date ...

Plaintiffs argue that the Plan does not meet the requirements of this section because the

Debtor's interest in the Trust property is not tenancy by the entireties property, and would

therefore be available to Plaintiffs if liquidated under Chapter 7 and, thus, should be included in

Debtor's Plan.  Debtor asserts that the Trust property is still held by him and his wife as tenancy

by the entireties property and is therefore only available for their joint creditors, which the

Plaintiffs are not.

The first issue is whether Plaintiffs claims are in impaired classes.  Section 1129(a)(7)

requires a class to be impaired in order to reject the plan on this basis.  Under §1124, a class of

claims or interests is impaired unless the plan "leaves unaltered the legal, equitable, and

contractual rights to which such claim or interest entitles the holder of such claim or interest."  11

U.S.C. § 1124(1).  There is a strong presumption of impairment in this district and "even the

slightest impairment will entitle a creditor to vote on the confirmation."  *See In re Wilhelm*, 101

B.R. 120, 122 (Bankr. W.D. Mo. 1989).  The burden is placed on the debtor as plan proponent to

demonstrate that the plan leaves the creditor's rights unaltered.  *See In re PPI Enterprises, Inc.*,

324 F.3d 197, 203 (3rd Cir. 2003).  Impairment is a term of art, extending beyond a worsening of a

creditor's position to include virtually any alteration of the rights of interested parties beyond

those specifically designated in §1124 as not affecting impairment.  *In re L&J Anaheim Assoc.*,

995 F.2d 940 (9th Cir. 1993).  Any impairment, no matter how insignificant, renders the entire

claim impaired under the plan.  *Wilhelm*, 101 B.R. at 122.

In this case, the Court must look at the following analysis regarding whether the Trust

Property is exempt property of the estate or not to determine whether the Plaintiffs' rights have

been altered by the Plan.  Plaintiffs argue that they are impaired because the Plan will not pay

them the full amount that they would be owed based on their liquidated, allowed claims.  But the

question here is whether, in a liquidation/best interest of creditors analysis under § 1129(a)(7), the

Plan need include the Trust Property value because it is Debtor's individual estate property

(which has not been done), or whether it is tenancy by the entireties property and thus not

required to be included as payment to his individual creditors. Based on the analysis that follows,

the Court finds that Plaintiffs' rights are in fact impaired under the Plan since they may be

receiving less than what they would receive in a Chapter 7 if the Trust Property were liquidated.

Further, the Plan proposes to pay Plaintiffs monthly over a period of sixty months, thus delaying

receipt by Plaintiffs of whatever amounts their allowed claims are determined to be[74].  Thus,

Plaintiffs' legal and equitable rights have certainly been at least slightly altered and thus impaired.

*See In re Haardt*, 65 B.R. 697 (Bankr. E.D. Pa. 1986) (court held creditor's rights impaired where

payment on claims might take 120 days or more after confirmation); *see also, In re Country

U.S.A., Inc.*, 74 B.R. 28 (Bankr. S.D. Fla. 1987) (court held claims impaired where debtors

proposed to pay them in quarterly installments beginning 90 days after effective date).

Accordingly, Plaintiffs are entitled to vote on and object to the Plan, which they have done.

The Plaintiffs have not accepted Debtor's proposed plan so the Court must determine

whether the Plaintiffs will receive not less under the plan than they would if the case were

converted to a Chapter 7 pursuant to §1129(a)(7).  Plaintiffs contend that under a Chapter 7

liquidation, they would be entitled to repayment from Reuter's liquidated interest in the Trust

Property.  Debtor counters that the Trust Property is an exempt asset under § 522(b)(3)(B), which

exempts property held with a non-debtor spouse as tenants by the entirety.

The bankruptcy estate succeeds to "all legal or equitable interests of the debtor in property

as of the commencement of the case," including those powers that the debtor may exercise for his

own benefit. 11 U.S.C. § 541(a)(1), (b)(1). Where there is no provision in a trust restraining

voluntary or involuntary alienation of any of the beneficiary's interest in the trust, every right of

the debtor under the trust is property of the estate.  *See In re Woods*, 422 B.R. 102, 107-08

---

[74]The Plan proposes to pay Plaintiffs' claims as allowed claims for a period of 60 months, pro rata, a sum which upon completion of such sixtieth (60th) monthly payment shall be equal to the difference of all other property to be distributed under the Plan to the holders of claims within such classes and the Debtor's projected disposable income.  See Debtor's Plan, ¶ 4.3.6.

(Bankr. W.D. Ky. 2010).  Any interest which a debtor retains in a trust is property of the estate,

including the power to amend the trust and the power to revoke a revocable trust and recover the

remaining funds in the trust for the benefit of the creditors. *See Askanase v. LivingWell, Inc.*, 45

F.3d 103, 106 (5th Cir. 1995); *In re Gifford,* 93 B.R. 636, 640 (Bankr. N.D. Ind. 1988). "Thus,

what comes to the bankruptcy estate is not only the property in which debtor has an interest, but

also, the powers the debtor can exercise for its own benefit over property regardless of the title

debtor may be acting under." *Id.*  Therefore, any interest Debtor has in the Trust Property is

property of the estate.  Here, it is clear that with the consent of the co-trustee, Debtor has the

power to revoke the Trust.  This power along with Debtor's beneficiary interest in the Trust are

clearly property of the estate under § 541.  *See, e.g., Woods*, 422 B.R. at 108.

Therefore, the Court must determine whether the Trust Property is in fact held by Debtor

and his wife as tenants by the entirety and thus is exempt from Debtor's individual creditors[75], or

whether the tenancy by the entireties status has been severed and Debtor's share of the Trust

Property is non-exempt property of Debtor's estate.  If the Court finds that Debtor has severed the

tenancy by the entireties status, then the non-exempt separate property of Debtor must be

included in the proposed plan, which it is not.

Debtor is claiming an exemption, and Plaintiffs are disputing such exemption, in the

following assets: (1) his interest in Green Meadow Properties; (2) his interest in Bluff Creek

Properties; and (3) cash proceeds from the sale of a residence located on Woodberry Court in

Columbia, Missouri.  *See* Plaintiffs' Brief, p. 91.  Plaintiffs contend that *In re Stanke*, 234 B.R.

---

[75]The Court notes that it has the same concerns the *Stanke* court had regarding how it would characterize
the interests held in the entireties property if it found that Debtor and his spouse had not severed the tenancy through
their conduct.  If the property is held by two trusts or by Debtor and his spouse as co-trustees this seems to violate
the requirement that only married persons can hold property as tenants by the entirety.

439 (Bankr. W.D. Mo. 1999) controls the outcome of this case, while Debtor argues that *Stanke* is distinguishable.

The possessory estate known as a tenancy by the entirety is created in the same way as a joint tenancy--unity of time, title, interest and possession--with the additional qualification that a tenancy by the entirety can only be possessed by a husband and wife. Commentary on Possessory Estates, Vol. 23 V.A.M.S., § 40, p. 37-38 (1949). Additionally, any conveyance of property to a husband and wife is presumed to create a tenancy by the entirety. *Nelson v. Hotchkiss,* 601 S.W.2d 14, 18-19 (Mo. banc 1980); *Davidson v. Eubanks,* 189 S.W.2d 295, 297 (Mo. 1945). This presumption is rebuttable, however, and a husband and wife may take property as joint tenants or tenants in common if language indicating which estate is being created is included in the conveying instrument. *Id.*

The other distinguishing characteristics of a tenancy by the entirety are that property held as such cannot be seized to satisfy the individual debts of one of the spouses, *Garner v. Strauss,* 952 F.2d 232, 234-35 (8th Cir. 1991), and that the tenancy cannot be terminated, severed or generally "affected" by one of the spouses acting alone. *Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Shackelford,* 591 S.W.2d 210, 214-215 (Mo. Ct. App. 1979); *Coffey v. Coffey,* 485 S.W.2d 167, 170 (Mo. Ct. App. 1972). A husband and wife, however, can freely terminate the tenancy through their joint acts.  When a tenancy by the entirety is severed, the result is a tenancy in common. *Ronollo v. Jacobs,* 775 S.W.2d 121, 123 (Mo. banc 1989).

> Personal estates held by the entirety can be changed to other types of estates by consent, agreement or acquiescence. The husband and wife can by consent, agreement, or acquiescence change the character of entirety property.  A tenancy by the entirety may be severed during the lifetime of the parties by agreement, actual or implied, or by any conduct or course of dealing sufficient to indicate that all parties have mutually treated their interests as belonging to them in

-73-

> common. The change, however, cannot be effected by the unilateral act,
> understanding or conduct of one of the spouses. To cause such a change the
> husband and wife must act together in a joint and mutual effort.

*Merrill Lynch,* 591 S.W.2d at 214 (citations and internal quotes omitted).

In *Stanke*, the Court looked at several factors in determining that the debtors had severed the tenancy by the entireties status of their trust property. This Court will address each of those factors as they relate to this case. First, the *Stanke* Court considered the transaction as a whole. It determined that the two tenancy agreements, two trust agreements, two assignments of personal property to the newly created trusts, and several deeds conveying property to the trusts, were all executed for the apparent purpose of creating two trusts that would have favorable tax consequences for the debtors and their heirs. *Stanke*, 234 B.R. at 443. The Court noted that the debtors could not achieve that purpose unless they had severed the tenancy by the entirety when the transferred the properties into the trusts[76]. Likewise, although Debtor does not address the tax consequence issue in his brief, he did testify in a deposition that he created the trusts for estate planning purposes[77]. Also, the Interspousal Agreement signed by Debtor and his spouse specifically states:

> We have determined that it is advantageous for us to restructure ownership of our property
> and assets, or some portion thereof, so that we may lawfully avoid or minimize, to the
> extent lawfully practicable, the burden of federal and state estate taxation which would
> otherwise be imposed at our respective deaths. To that end, we are each adopting or
> creating a revocable trust....

As *Stanke* noted, in order to achieve that objective, Debtor and his spouse necessarily must have severed their tenancy by the entireties and created a tenancy in common. The Court

---

[76] Citing 26 U.S.C. § 2056; *see also*, Boris I. Bittker and Lawrence Lokken, Federal Taxation of Income, Estates and Gifts § 129.6 (2nd ed. 1993).

[77] Plaintiffs' Exhibit 79, p. 24:20-23.

acknowledges that the document in *Stanke* included explicit language that the debtors "now wish

to convert all or part of their joint tenancy property into tenancy in common property."  It further

stated that the debtors "hereby grant, convey, and transfer their respective interest in their joint

tenancy property to themselves as tenants in common...."  However, the *Stanke* court did not rely

solely on that language, nor on any single factor, and neither will this Court.  Debtor argues that

the Interspousal Agreement declared that they intended to preserve the tenancy by stating that

"none of the changes in the form of ownership of our property will affect or modify the present,

or future character of such property, as marital or non-marital (separate) property for dissolution

of marriages purpose.[78]"  The Interspousal Agreement states such intention in three separate

paragraphs.  However, in this Court's view, this only reinforces the fact that the Debtor and his

spouse were only concerned with maintaining the character of the property for "dissolution of

marriages purposes" and not for other purposes.  It thus has little or not bearing on the issues

before this Court.

        In *Stanke*, the court also looked at the trust document and determined that it contained

"provisions that would be inconsistent with the characteristics of a tenancy by the entirety,

specifically that property held as tenants by the entirety cannot be encumbered, sold or (the

tenancy) severed by the unilateral act of one of the owners." 234 B.R. at 444.  Here, Debtor

argues that Debtor and his spouse, as trustees, can administer the assets of the Trust only "acting

jointly" and that neither of them have any authority to do anything unilaterally.  Plaintiffs contend

that the Trust document is inconsistent with a tenancy by the entirety.  After reviewing the

document, as in *Stanke*, this Court finds that the following provisions in the Trust document

---

[78]Debtor's Exhibit 109, D.1. & 2.

giving Kathleen Reuter control over the property in the Trust are incompatible with a tenancy by
the entirety:

> *Article II, B.  In addition, the trustees shall distribute to me or others such amounts of net
> income and principal as I, if not disabled as determined under paragraph C of this
> Article, may from time to time direct in writing.*

This paragraph is clearly at odds with a tenancy by the entireties concept.  It states that the
trustees **shall** distribute to **me** (being Kathleen Reuter) whatever amounts **I** may direct in writing.
This right is not limited by any other provision in the Trust and is in direct contradiction to the
primary characteristic of tenancy by the entireties property that neither spouse may burden the
property unilaterally.  *Compare In re Bellingroeher*, 403 B.R. 818, 820, fn6 (Bankr. W.D. Mo.
2009) (citing *United States v. Becker*, 2005 WL 6120994 at *10 (E.D. Mo. 2005) (holding that
where trust agreement did not prohibit husband from altering trust holdings unilaterally, property
was held by spouses as tenants in common)).  In *Bellingroeher*, the court noted that the main
reason it determined that the property transferred into the trust remained tenancy by the entireties
property was because neither of the trustees could transfer any asset of the trust without the
consent of the other.  *Bellingroeher*, 403 B.R. at 821.  Based on the plain language of the Trusts
quoted above that is clearly not the case here.  The following provisions are also in contradiction
of the characteristics of tenancy by the entireties:

> *Article VIII, A.  Any trustee acting hereunder may resign at any time by delivering not less
> than thirty days written notice....*

> *Article VIII, B.  If I cease to act as trustee hereunder for any reason, then my spouse,
> Nathan P. Reuter, shall serve as sole trustee hereunder.*

 If Debtor or his spouse should choose to "resign at any time" or ceases to act as trustee
for any reason, then the other spouse would be the sole trustee and have the power to encumber,

sell or burden the trust property unilaterally. *Compare Bellingroeher*, 403 B.R. at 820, fn6 (citing *Skwiot v. Skwiot*, 808 S.W.2d 27 (Mo. Ct. App. 1991) (holding that transfer to trust severed the entireties where trust gave husband exclusive power to terminate or revoke the trust instrument and to receive assets of trust as his own property)).

Debtor also argues that the *Stanke* court based its decision on the fact that the debtor was also a trustor under the trust which gave him certain rights to dispose of trust property.  Again, this was merely one factor that court looked at and even though this is not the case here, this Court finds that all of the other reasons discussed above are more than sufficient to determine that Debtor and his spouse intended to sever the tenancy by the entireties nature of the property.  For example, as noted, the fact that Debtor's spouse can at any time resign as trustee, thus enabling Debtor to act as sole trustee is inconsistent with the concept of tenancy by the entireties.

 Further, Debtor argues that because the transfers of property into the Trusts were by the Debtor and his spouse to the Debtor and his spouse, in their respective capacities as "spouse", and "as trustees acting jointly" that they intended to continue to hold the property as tenancy by the entireties property.  As discussed in *Stanke*, that the property was transferred to Kathleen Reuter and Debtor, "as trustees, acting jointly" creates a presumption that conveyances to co-trustees are presumed to be taken as a joint tenancy.  *Stanke*, 234 B.R. at 446 (citing *Columbia Union Nat. Bank and Trust Co. v. Bundschu*, 641 S.W.2d 864, 877 (Mo. Ct. App. 1982)).  Also, in the Interspousal Agreement, Debtor and his spouse are referred to as "Nathan P. Reuter and Kathleen S. Reuter, husband and wife" and in the Trust documents the property is transferred to Kathleen S. Reuter and Nathan P. Reuter, as trustees, acting jointly.   Applying the rule of construction *expressio unius est exclusio alterius*- the expression of one is the exclusion of all others, as the

*Stanke* court did, the fact that the terms "husband and wife" were used in the Interspousal

Agreement and not used in the transfer language of the Trust documents indicates they did not

intend to take the property as husband and wife and therefore, as tenants by the entirety.

Based on the above analysis and discussion, the Court finds that, as in *Stanke,* the conduct

of Debtor and his spouse in establishing the Trusts and transferring the Trust Property indicated

an intent to sever the entirety interests they held in the Trust Property and rebutted the

presumption that the transfers of the Trust Property were to Debtor and his spouse as tenants by

the entirety.  The result is that the Trust Property held in the Trusts is held as tenants in common

by Nathan P. and Kathleen S. Reuter and therefore Debtor's interest is not exempt under §

522(b)(2)(B).

To that, Debtor also argues that he holds only "legal" title in the Trust Property as

"trustee" and thus, even if the tenancy by the entireties was found to have been severed, Debtor

has no present interest in the Trust Property that could be distributed to Plaintiffs.  However,

Debtor does hold equitable title as beneficiary, even if it is contingent, and *any* interest which a

debtor retains in a trust is property of the estate.  *Askanase*, 45 F.3d at 106 (Defendant had a

reversionary interest in the trust because any funds remaining in the trust after termination were to

be returned to it; thus the bankruptcy estate succeeded to all rights or interests of defendant under

the trust agreement).  A beneficial interest in a trust is an equitable interest under § 541(a)(1)

despite the fact that at the time of filing a bankruptcy petition the debtor's interest is unvested and

contingent.  *In re Neuton*, 922 F.2d 1379, 1382-83 (9th Cir. 1990).  "The mere fact that the interest

of the benficiary is contingent and not vested does not preclude creditors of the beneficiary from

reaching it."  *Id.* (quoting Restatement 2d of Trusts § 162).  "The beneficiary of a trust can

transfer his interest whether it is a present or future interest, and whether it is a vested or contingent interest." IIA, Scott, The Law of Trusts § 132, p. 8 (4th ed. 1987).

Debtor also makes the argument that even if the tenancy by the entirety status of the Trust Property was severed, that Debtor has no interest in the Trust absent avoidance of the transfer itself. Debtor argues that the transfer is not voidable as in "fraud of creditors" under Missouri's Uniform Fraudulent Transfer Act because entireties property is not susceptible to "fraudulent transfer." He also asserts that a transfer of property by one tenant by the entirety to the other cannot be fraudulent as to creditors of the transferor even when accompanied by actual fraudulent intent nor can the transfer be constructively fraudulent simply because the transferor received "less than reasonably equivalent value in exchange" under § 548(a)(1)(B). However, these arguments are simply not relevant at this juncture. There is no question that Debtor has a contingent beneficial interest in the Trust which is property of the estate and for which no recovery or avoidance is necessary. As to the Trust Property, the Court has determined it is no longer held as tenants in the entirety and it is not necessary now for the Court to determine whether an avoidance action is appropriate or valid. At this point, the necessary finding is only that as discussed in detail above: the acts and conduct establishing the Trust clearly indicate an intent to sever the tenancies by the entirety and rebut the presumption that the conveyances of the Trust Property were to Debtor and his spouse as tenants by the entirety and thus, the Trust Property is held as tenants in common. As such, Debtor's interest in the Trust Property as a tenant in common is property of the estate.

The specific value of Debtor's interest in the Trust Property or how that value will be realized is not the issue before this Court. Instead, the Court need only find that Debtor has not

-79-

met his burden of proof by a preponderance of the evidence that his plan is proposed in the best

interest of the creditors/Plaintiffs and that they would not receive more if Debtor's interest in the

Trust Property were to be liquidated by a trustee in a Chapter 7 proceeding.  The Court leaves for

another day, if the case is converted to a Chapter 7, for a trustee to make whatever arguments he

or she determines are necessary to attempt to realize the value of the Debtor's interest in the Trust

Property.

## V. CONCLUSION AND ORDER

In summary, the Court finds that under 11 U.S.C. § 523(a)(2)(A) all Plaintiffs' debts are

excepted from discharge and that they have incurred damages in the following amounts:

| Plaintiff | Actual Damages (recoverable under common law and Mo. Rev. Stat. §409.5-509(b)(3), but Plaintiffs may recover pursuant to only <u>one</u> of the available legal theories) | Punitive Damages (recoverable under common law, not pursuant to Mo. Rev. Stat. §409.5-509(b)(3)) | Attorneys' Fees (recoverable under Mo. Rev. Stat. §409.5-509(b)(3)) |
|---|---|---|---|
| Mike Trom | $175,000 | twice the actual | tbd |
| LaDonna S. Henderson | $292,728 | twice the actual | tbd |
| James A. Fields | $50,000 | twice the actual | tbd |
| James D. Fields | $100,000 | twice the actual | tbd |
| Patricia A. Reitz | $50,000 | twice the actual | tbd |
| Terry J. Schippers | $50,000 | twice the actual | not available |
| James D. Teegarden | $50,000 | twice the actual | not available |
| Joshua P. Haeflinger | $100,000 | twice the actual | not available |
| Tana S. Cutcliff | $50,000 | twice the actual | not available |

The Court further finds that punitive damages shall be awarded to all Plaintiffs in the amount of twice their actual damages pursuant to common law;

The Court further finds that Trom, Henderson, J. Fields, T. Fields and Reitz are entitled to reasonable attorneys' fees pursuant to Mo. Rev. Stat. §409.5-509(b)(3).  The Court will schedule a hearing to determine the amount of attorneys' fees.

Furthermore, the Court will not confirm the Debtor's Chapter 11 Plan because the Court finds that the Plan was not filed in good faith pursuant to 11 U.S.C. § 1129 (a)(3), is not feasible under § 1129(a)(11) and is not in the best interest of creditors under § 1129 (a)(7)(A).  For all the reasons discussed above, Plaintiffs' Objection to Confirmation is sustained.

A separate Order will be entered in accordance with Bankruptcy Rule 9021.


Dated:    April 14 , 2010            /s/ Dennis R. Dow
                                     THE HONORABLE DENNIS R. DOW
                                     UNITED STATES BANKRUPTCY JUDGE

-81-